*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0262P (6th Cir.)
File Name: 02a0262p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

No. 00-5662
UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

v.

JAMES ELKINS; CAROL
ELKINS,
          *Defendants-Appellees.*

Nos. 00-5771/5772
UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

CAROL ELKINS (00-5772);
JAMES ELKINS (00-5771),
          *Defendants-Appellants.*

Nos. 00-5662/
5771/5772

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 96-20152—Bernice B. Donald, District Judge.

Argued: September 11, 2001

1

Decided and Filed:  August 2, 2002

Before:  SILER, CLAY, and GIBSON, Circuit Judges.[*]

_____

**COUNSEL**

**ARGUED:**  Thomas A. Colthurst, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Plaintiff. Michael J. Stengel, Memphis, Tennessee, A. C. Wharton, Jr., WHARTON, WHARTON & ASSOCIATES, Memphis, Tennessee, for Defendants.  **ON BRIEF:**  Thomas A. Colthurst, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Plaintiff.  Michael J. Stengel, Memphis, Tennessee, A. C. Wharton, Jr., WHARTON, WHARTON & ASSOCIATES, Memphis, Tennessee, for Defendants.

_____

**OPINION**

_____

JOHN R. GIBSON, Circuit Judge.  The United States appeals, pursuant to 18 U.S.C.  § 3731 (2000), from an order of the district court suppressing evidence of a marijuana growing operation found in buildings controlled by James and Carol Elkins.  The Elkinses, husband and wife, have entered conditional guilty pleas to several charges,[1] and appeal from

---

[*]    The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

[1]  James Elkins pleaded guilty to the Superseding Indictment's Count 3 (possessing and manufacturing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2); Count 12 (money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2); and Count 18 (possession by convicted felon of firearms shipped in interstate commerce, in violation of 18 U.S.C. § 922(g)).  Carol Elkins

---

## VIII.

In summary, we affirm the district court's suppression order insofar as it held that the warrantless search of 139/155 Scott was justified by James Elkins's consent, and that the redacted search warrant affidavit for 146 Neil established probable cause.  We reverse the order insofar as it held that exigent circumstances did not exist for the warrantless search of 2896 Walnut Grove, and that the redacted search warrants for 2896 Walnut Grove and the Elkinses' home at 1270 Tutwiler were invalid.  We also affirm the district court's order authorizing the release of seized funds to pay counsel.

We remand for further proceedings in conformity with this opinion.

### VII.

Early in the prosecution, the government seized assets controlled by the Elkinses and began civil forfeiture proceedings. The Elkinses voluntarily waived an adversary due process hearing on these seizures in return for the government's promise to release seized funds in an amount judicially determined to be necessary for reasonable attorneys' fees. The Elkinses requested $350,950, stating that they needed this amount to hire their counsel of choice. A magistrate judge extensively analyzed the likely course of the litigation and recommended releasing $100,000, with a right to review the amount for good cause. The district court affirmed the magistrate's order but increased the amount to $150,000.

Carol Elkins argues that the district court committed reversible error by not releasing the Elkinses' assets in the full amount sought. We have recognized, in the similar context of reviewing rates for fee awards to civil rights plaintiffs, that in deciding an appropriate level of fees for a given litigation the district court "is entitled to substantial deference." *Reed v. Rhodes*, 179 F.3d 453, 469 n.2 (6th Cir. 1999). The Elkinses, however, argue that the choice of a reasonable level of attorneys' fees to exempt from civil forfeiture implicates their qualified Sixth Amendment right to criminal counsel of choice, *see, e.g.*, *United States v. Michelle's Lounge*, 39 F.3d 684, 694-95 (7th Cir. 1994). We need not decide this issue. Reviewed de novo, the district court's award of fees was reasonable in light of the issues in the case: pretrial standing and suppression hearings for searches at several locations, with some issues requiring expert testimony. We therefore affirm the district court's order, which included the right of review for good cause shown, should it be deemed necessary.

rulings in the same order holding certain evidence from their buildings to be admissible. We affirm the order in part and reverse in part. Carol Elkins also appeals from an order of the district court releasing seized funds to pay the Elkinses' attorneys' fees. She claims the amount released was unreasonably small. We affirm the order.

### I.

In the middle of 1996, Memphis police received anonymous information that there was a marijuana growing operation at 155 Scott Street, at the building behind 155 Scott, and at 1270 Tutwiler Avenue, James Elkins's home.

The police began surveillance of the Scott Street property named in the tip. This building was divided into two parts with separate doors and addresses, 139 Scott on one side and 155 Scott on the other. In intermittent surveillance of the building over a period of two months, the police saw James and Carol Elkins come and go from it. They also saw several men whom they recognized as off-duty Memphis police officers. On one occasion during the surveillance, the investigators approached James Elkins and spoke with him. Elkins told them he was employing off-duty policemen to safeguard his businesses against burglaries. Elkins said that he had businesses in the Scott Street building and in a building close by on Neil Street. The police then turned their attention to 146 Neil Street, a nearby building where they had earlier seen several cars stopping at night. They observed a pallet near 146 Neil stacked with bags of sheep manure fertilizer. During the course of the surveillance the police also learned that James Elkins had at least one former felony conviction.

The officers began a more intensive surveillance of the Scott and Neil Street properties and the Elkinses' home on the

---

pleaded guilty to the Superseding Indictment's Count 12 (money laundering). Most of the other charges against the Elkinses were severed.

evening of August 20, 1996, aided by equipment and personnel from the Tennessee National Guard. They used a thermal imaging device to scan heat emanating from 139/155 Scott and 146 Neil, and detected an unusually high heat output at 146 Neil.[2] On that night police also encountered an off-duty officer named Smith guarding the Scott Street building. Smith stated that he worked for James Elkins, guarding both the Scott Street building and another Elkins building on Walnut Grove in Memphis. Smith led the investigating officers to this building, which was 2896 Walnut Grove. At one point he offered to let them in, but the police declined to enter. A police helicopter later flew over 2896 Walnut Grove and scanned it with an airborne thermal imager. This building also had a high heat signature.

Later that night Officer Frank Bell, accompanied by Captain Terry Livingston of the National Guard, went to 2896 Walnut Grove to inspect its exterior. A "No Trespassing" sign hung on the building. On its east side was an unpaved path used to reach an apartment building behind the Elkinses' property. Stepping onto that path, Bell saw a PVC pipe protruding from the east wall of 2896 Walnut Grove at a height of two or three feet. There was an open gap of somewhat less than an inch in width around the exposed pipe. Bright light emitted from the gap. Bell and Livingston bent down and peered through it. Bell observed marijuana leaves inside the building; Livingston observed green leaves but did not identify them more precisely. Bell then called Officer Joe Hoing to the scene and Hoing also saw identifiable marijuana leaves through the gap. While bending down to look, Bell

---

[2]High heat outputs may be a sign that a building houses a marijuana growing operation, since the indoor cultivation of marijuana commonly employs high-energy lamps. *Kyllo v. United States*, 533 U.S. 27, 29 (2001).

goes a considerable way toward establishing the warrant's validity. This court has held that an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search. *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993). The same may be true when marijuana is smelled within a home. *See United States v. Tobin*, 923 F.2d 1506, 1512 & n.4 (11th Cir. 1991); 2 LaFave, *Search and Seizure* § 3.6(b), at pp. 290-92; *see also United States v. Gonzalez*, No. 94-6503, 1995 WL 626286, at *3 (6th Cir. Oct. 24, 1995) (unpublished opinion) (per curiam) (holding that smell of marijuana alone created probable cause for roadside search of a motor home). Our probable cause inquiry is somewhat easier: as noted above, the smell of marijuana here does not stand alone in the warrant affidavit, but is accompanied by an anonymous tip that the Elkinses were growing marijuana in their home, a tip that the smell of marijuana strongly corroborated. A sufficiently corroborated tip of drug activity can support a warrant to search a home. *United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir. 1993). This court held in *United States v. Smith*, 783 F.2d 648 (6th Cir. 1986), that a reliable informant's unadorned tip that an individual was producing marijuana at his house, coupled with the police's observation of a marijuana plant outside the house, supported a warrant to search the interior. *Id.* at 651-52. Here, though we deal with an anonymous informant's tip, we similarly hold that the three officers' detection of the marijuana smell inside the house corroborated the tip enough to establish probable cause for a warrant. The drugs and other evidence observed and seized from 1270 Tutwiler on August 21, 1996, are admissible.

Because the second affidavit to search 1270 Tutwiler, dated August 22, 1996, followed quickly on the first warrant, and properly recounted the array of illegal contraband that the police found there when executing the first warrant, we hold that the second warrant was also supported by probable cause.

The Elkinses did not dispute below the affidavit's statement that the officers' experience permitted them accurately to identify the smell of marijuana. The district court's analysis cast no doubt on the assertion. Hence it also remains.

The affidavit also stated that police detected a strong odor of marijuana in the house. The district court's suppression order discussed this in several places as a factual dispute. *See* 95 F. Supp. 2d at 804 n.14, 826-27 & n.44. The court found a "significant credibility issue" raised by the fact that the officers left 1270 Tutwiler with James Elkins after allegedly smelling marijuana inside, leaving Carol Elkins behind in the house despite the risk that she might destroy evidence. *Id.* at 804 n.14. But it went no further. The fact that the court recognized doubts about the credibility of a statement does not authorize us to infer that it deemed the statement to be recklessly false. As we have said, the court did not summarize its *Franks* holdings in respect to the 1270 Tutwiler affidavits. However, after reviewing the relevant parts of the district court's discussion, we conclude that the court did not find the statement in the first 1270 Tutwiler affidavit that the police smelled marijuana to be recklessly and materially false. Moreover, the district court's ultimate legal conclusion that the redacted affidavit was defective does not imply a finding that the police lied about smelling marijuana. Quite the contrary, the district court made a point of indicating that in its view the smell of marijuana need not save the warrant. *See* 95 F. Supp. 2d at 827 ("The court agrees [with the United States] that the smell of marijuana alone *could* be sufficient to supply . . . probable cause for the issuance of the warrant.") (emphasis in original). In a *Franks* hearing statements with evidentiary support remain in the affidavit if not struck as recklessly and materially false. The statement that a strong smell of marijuana was detected in the Elkinses' home was supported by the three officers' testimony. It remains in the redacted affidavit.

That conclusion, coupled with the uncontested statement that the officers were experienced at recognizing the smell,

heard a sound from within the Elkinses' building that he believed came from ballasts operating inside.[3]

After making these observations, Bell and Livingston remained near 2896 Walnut Grove to continue surveilling it while other officers prepared a warrant application for the building. Hoing left to join a second group of officers investigating the Elkinses.

The next morning, Officers Hoing, Duane Gary, and Dion Cicinelli went to the Elkinses' home at 1270 Tutwiler. They told the Elkinses they had received a complaint about a marijuana grow at Scott Street, but James Elkins denied any involvement with a marijuana grow. He gave the officers permission to search his home, and Carol Elkins escorted them through parts of it. The officers saw no contraband, but each later testified that there was a strong, identifiable odor of marijuana in the Elkins home. The officers then requested permission to search 155 Scott. James Elkins agreed, saying that the police could look anywhere they wanted to.[4]

Elkins then drove Gary to Scott Street in his own car, choosing an indirect, circuitous route. The other officers followed, but Carol Elkins did not accompany them. At one point during the drive Elkins made a cellular phone call to an unidentified individual. Officer Gary testified that he could

---

[3] Ballasts are electrical devices commonly used to regulate current flow to high-wattage lamps and other items.

[4] Testimony was inconsistent on whether the officers' initial request to search also mentioned the 139 Scott address. Elkins testified that the officers asked only about the 155 Scott address. Hoing testified that Elkins specifically consented to a search of 139 Scott. Cicinelli said he thought Hoing referred to 155 Scott in the conversation. The district court found that "specific permission was only given to search 155 Scott Street at that time." *United States v. Elkins*, 95 F. Supp. 2d 796, 814 (W.D. Tenn. 2000). The testimony could be taken to support this view, so the district court's finding is not clearly erroneous.

not hear what Elkins said but believed he was speaking to his wife.

Once Elkins arrived, he led the officers through 155 Scott, where they found nothing incriminating. The officers asked if they could also search 139 Scott, the other portion of the building. Elkins verbally agreed to this search; the officers testified that he said "sure."

When the officers emerged from 155 Scott with James Elkins, they saw an unoccupied Cadillac newly parked next to the building. The officers recognized it as Carol Elkins's car, which had been parked at the Elkins home that morning. James Elkins attempted to unlock the door to 139 Scott, but could not find a matching key. He called to his wife, who was now inside the building, to open the door. Carol Elkins eventually opened the side door and admitted James Elkins and the officers.

The officers searched 139 Scott, accompanied by the Elkinses. They eventually found a cabinet which, when opened, contained metal trays of marijuana. They also found plant chemicals, fertilizer, scales, ledger sheets, and other paraphernalia possibly linked to marijuana growing. At one point the officers turned their attention to 139 Scott's attic, and James Elkins pointed out a ladder that the police could use to access that area. In the attic the officers found several electric lights.

During the search the officers came to suspect that there was a hidden space between the walls of 139 and 155 Scott. Elkins admitted that there was such a space. When it became clear that the officers intended to open a hole in the wall to access it, Elkins pointed out a spot where the hole could be made with the least damage to the building. The officers found a hidden room containing a great deal of equipment used in growing marijuana. Remnants of marijuana growing were visible on the floor.

informant) stating that Elkins was growing marijuana at his home at 1270 Tutwiler and in an adjacent building. *See Elkins*, 95 F. Supp. 2d at 826 n.43 (setting out the affidavit's text).

With respect to the last statement above, the district court found that the police had a tip about 1270 Tutwiler, but it came from an anonymous informant. As with the 146 Neil warrant affidavit, it held that this was a material discrepancy suggesting reckless falsity. *See* Part IV *supra*. The court ruled that "the statement . . . characterizing the anonymous caller as a confidential informant" would "not be considered" in deciding whether the warrant was supported by probable cause. *Id*. at 827. We hold, as we did in considering the 146 Neil affidavit, that this ruling was correct as to materiality and not clearly erroneous as to reckless falsehood.

There is a question, though, about how much of the warrant text should be excised as a result of this misrepresentation. Since the district court specifically found that the police *did* receive a tip with the content claimed in the affidavit (albeit an anonymous one), it would not be appropriate to strike all references to the tip from the affidavit – only the false reference to the informant's "confidential" character should be struck. It is not entirely clear to us that the district court proceeded in this way, since it did not summarize the contents of the redacted 1270 Tutwiler affidavit after finishing its analysis. However, we believe that this approach is prescribed by *Franks v. Delaware*. In that decision, the Supreme Court made clear that a showing of a *Franks* violation requires no more or less than that "the affidavit's false material [be] set to one side," while "the affidavit's remaining content" is analyzed to see whether it creates probable cause. 438 U.S. at 156; *see* 2 LaFave, *Search and Seizure* § 4.4(c), at p. 498 n.52 ("It would seem that [under *Franks*] even if false and true statements are commingled only the false part need be disregarded."). Therefore the properly redacted affidavit includes a reference to a (merely anonymous) tip about marijuana growing at 1270 Tutwiler.

circumstances existed to support a warrantless entry into the building for the purpose of securing it.[13]

It follows that evidence that the police observed while securing the premises is admissible and was properly included in the warrant affidavit to search 2896 Walnut Grove. *See Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987) (stating that visual inspection of items which come into an officer's view while he is validly searching a house's interior for a suspect pursuant to exigent circumstances does not constitute an illegal search). Here, the police observed a large number of marijuana plants while inside the building. This plainly established probable cause to search 2896 Walnut Grove for marijuana and drug paraphernalia. Hence the warrant was valid. We need not consider the district court's other contested *Franks* rulings with respect to the 2896 Walnut Grove affidavit.

### VI.

The government next argues that the district court erred by holding inadequate the two affidavits used to procure warrants to search the Elkinses' home at 1270 Tutwiler.

The first affidavit, dated August 21, 1996, stated: (1) officers visited James Elkins's home at 1270 Tutwiler to speak with him about a complaint that Elkins was growing marijuana at 139 Scott Street; (2) Elkins then invited the officers inside; (3) the officers could smell a strong odor of marijuana in the house; (4) the officers had substantial experience identifying the smell of marijuana; and (5) the officers had received a tip from a "C/I" (confidential

---

[13]As a final consideration supporting the warrantless entry here, we note that the police had already applied for a warrant when the car drove up to 2896 Walnut Grove. Thus, this was not a case where the police chose to forego seeking a warrant "in the hope that exigent circumstances would arise." *Sangineto-Miranda*, 859 F.2d at 1513 (quoting *United States v. Socey*, 846 F.2d 1439, 1447 (D.C. Cir. 1988)).

The officers then asked Elkins for permission to search 146 Neil. Elkins at first agreed to the search, but then verbally declined and asked to speak with his attorney. The officers testified that Elkins said that a search of 146 Neil would only make things harder for himself. The Elkinses, now handcuffed, were taken to the police station around 11:00 a.m. Officers Hoing, Gary, and Cicinelli began preparing affidavits for warrants to search 146 Neil, 2896 Walnut Grove, and the Elkinses' home at 1270 Tutwiler.

While the affidavits were being prepared, Officer Bell and Captain Livingston were at 2896 Walnut Grove, watching the location from their car. At around noon, a car containing two Hispanic males drove up to the building. The car stopped close to the building's entrance. By this time Bell and Livingston had learned of the arrests of the Elkinses. They began to drive toward the stopped car, intending to keep the occupants from entering 2896 Walnut Grove. One of the occupants, later identified as Jesus Morales, got out of the car and entered the building. The officers pulled up next to the car and detained the remaining occupant, Raul Sandoval. As they detained Sandoval, Morales exited 2896 Walnut Grove, saw the officers detaining his colleague, and went back inside, locking the door. Livingston was wearing a police shirt and camouflage pants when Morales saw him.

Bell then radioed Officer Hoing to seek advice about how to secure the building. Hoing eventually contacted a state prosecutor. The prosecutor advised the officers to enter 2896 Walnut Grove, remove the man inside it, and wait for a warrant.

The officers entered 2896 Walnut Grove by forcing the locked door. Inside the building they found four men, including Morales. They also observed an extensive array of marijuana plants as well as two shotguns. The police then left the building, but one of the men they had seized told them that two more men were inside. The police re-entered the building twice to search for other persons. Using a police

dog, they eventually uncovered a space in the ceiling where two additional men were hiding. The officers arrested all six men.

The officers obtained the three search warrants that afternoon, and executed them later on August 21. Their search of 2896 Walnut Grove uncovered an extensive marijuana growing operation, including approximately 1300 marijuana plants and dozens of high intensity growing lights. At 146 Neil the officers found 320 live marijuana plants and 700 harvested plants. They also arrested two men found in the building and seized some weapons. At the Elkinses' home at 1270 Tutwiler, the police again discovered an array of contraband. They found evidence of a dormant marijuana growing operation in the Elkinses' attic, four pounds of marijuana in a bag inside a wall, and a quantity of cocaine on a stairway leading to the attic. The following day, a different team of officers obtained a second warrant to search 1270 Tutwiler for hidden compartments, but found nothing. In the days that followed the police obtained several other warrants to search properties controlled by the Elkinses, but those searches are not relevant here.

James and Carol Elkins were indicted, then re-indicted, for a range of drug offenses involving the possession, manufacture, and distribution of marijuana, as well as money laundering and firearms possession.

The Elkinses moved to suppress the evidence seized from their buildings and requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the search warrant affidavits. After conducting an initial hearing on Fourth Amendment standing, the district court held the requested *Franks* hearing. It heard testimony about the investigation and searches over several days.

In a published suppression order, the district court upheld some of the searches but invalidated others. First the court considered at length the admissibility of the thermal imaging

Similarly, in *United States v. Ukomadu*, 236 F.3d 333 (6th Cir. 2001), the court held that police had a reasonable belief that evidence was likely to be destroyed when suspects opened up a shipment of drugs from which the police had removed most of the drugs, and in which they had planted a beeper. The visibly altered shipment, the court reasoned, would cause the suspects to realize police were on their trail and to try to destroy evidence. *Id.* at 337-38. The court went on to hold that exigent circumstances existed to support a warrantless entry to preserve that evidence. *Id.* at 338.

Conversely, in *United States v. Radka*, 904 F.2d 357 (6th Cir. 1990), this court held that no exigent circumstances arose to permit a warrantless search of a suspected drug house when police arrested a confederate of the house's occupants an eighth of a mile from the house. The court stated that the intervening ground was heavily wooded, and there was no sign "that the enforcement activity outside the premises would have come to the attention of anyone who might be on the property." *Id.* at 362. This "mere possibility" of destruction of drug evidence, it observed, was not a sufficient basis for a warrantless entry. *Id.*; *see also United States v. Haddix*, 239 F.3d 766, 767-68 (6th Cir. 2001) (holding no exigent circumstances arose when police saw marijuana plants surrounding defendant's house, then knocked on his door; police did not know whether defendant was home when they entered without warrant, and the mere fact that drugs were involved did not provide "an objectively reasonable basis" for believing that evidence would be destroyed) (quoting *Radka*, 904 F.2d at 361).

Here, it was clear that the man who entered 2896 Walnut Grove was aware of the close presence of police when he spotted them outside detaining his colleague. His observation of the police and re-entry into the building ("high-tail[ing] it inside," in the words of one of the officers), provided an objective basis for fearing the destruction of relevant evidence, namely the illegal marijuana that the police had observed inside the building. We hold that exigent

evidence, and so still failed the second part of the exigent circumstances test.

We disagree with this conclusion as well. Here no additional evidence of likely destruction was needed. This court has several times applied the exigent circumstances doctrine in situations where suspects had ready access to evidence of drug crimes. The decisions emphasize the question whether, immediately prior to the warrantless search, police had objective grounds to believe that suspects were aware that police were close on their trail. When the answer to this question is yes, this court has regularly held that exigent circumstances existed to support a warrantless search of the location in question.

Thus, in *Sangineto-Miranda* the court held that exigent circumstances were present when police, who had strong reason to think a suspect had drugs in an apartment, lawfully arrested the suspect's colleague, who had left the apartment on a brief errand during the negotiation of a drug deal. 859 F.2d at 1512-13. DEA agents had questioned the suspect earlier that day. The court concluded that under these circumstances, police could reasonably believe the continued absence of the suspect's colleague would alert the suspect that police were on their trail, thereby prompting him to destroy narcotics before the police could obtain a warrant. *Id.* at 1513.

In *United States v. Straughter*, 950 F.2d 1223 (6th Cir. 1991), the court held that exigent circumstances were present when police knew that several suspects were inside a house, knew that several of their co-conspirators had recently been arrested, knew that the suspects communicated by cellular phone, and reasonably believed that the suspects in the house had a large supply of cocaine. *Id.* at 1230. The court emphasized that no more than these facts was necessary to create a reasonable belief that the suspects in the house would learn of their comrades' arrest and try to destroy evidence. *Id.*

data. It held that the police use of thermal imagers to scan the Elkinses' buildings without a warrant was a violation of the Fourth Amendment, and excluded all thermal imaging evidence. *United States v. Elkins*, 95 F. Supp. 2d 796, 812-13 (W.D. Tenn. 2000). However, the court held that James Elkins validly consented to the searches of 139 and 155 Scott, rendering the evidence seized there admissible. *Id.* at 815-16. Next, the court held that the police's warrantless entry into 2896 Walnut Grove on August 21, 1996, was not justified by exigent circumstances. *Id.* at 818. Finally, pursuant to *Franks*, the district court evaluated the various warrant affidavits. It held some statements in each affidavit to be material misrepresentations and excluded them from consideration. After redacting the affidavits, the court held that the affidavit for 146 Neil still established probable cause. *Id.* at 829. However, it held that the redacted affidavits for 2896 Walnut Grove and 1270 Tutwiler were insufficient to establish probable cause, and excluded the evidence seized from those places. *Id.* at 826-27.

The Elkinses entered conditional guilty pleas to charges involving the drugs seized at 139 Scott and 146 Neil, creating, as to them, an appealable final decision. Each party then appealed the district court's adverse rulings to this court.

II.

The government challenges the district court's holding that the use of thermal imagers to scan the Elkinses' properties was a Fourth Amendment search requiring a warrant. *See* 95 F. Supp. 2d at 812-13.

At the time the briefs were submitted, most circuits had held that using a thermal imager was not a search, even when the device was used to scan the home,[5] which receives the

---

[5] *See, e.g., United States v. Kyllo*, 190 F.3d 1041 (9th Cir. 1999), *rev'd*, 533 U.S. 27 (2001); *United States v. Robinson*, 62 F.3d 1325 (11th Cir. 1995); *United States v. Ishmael*, 48 F.3d 850 (5th Cir. 1995); *United*

greatest protection under the Fourth Amendment. The Tenth Circuit had held that warrantless thermal imaging of a home did violate the Fourth Amendment, but the court en banc later vacated that opinion, leaving the issue unresolved. *See United States v. Cusumano*, 67 F.3d 1497 (10th Cir. 1995), *vacated*, 83 F.3d 1247 (10th Cir. 1996) (en banc).

The landscape changed sharply on June 11, 2001, when the Supreme Court handed down *Kyllo v. United States*, 533 U.S. 27 (2001), which recognized significant Fourth Amendment limitations on the use of thermal imagers. *Kyllo* announced the constitutional rule that "obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area' . . . constitutes a search – at least where . . . the technology in question is not in general public use." *Id.* at 34 (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)). Applying this rule, the Court held that when police in the street used a thermal imager to detect heat-generating activity in a defendant's house, they engaged in a search requiring a warrant. *Id.* at 34-35.

While *Kyllo* broadly protects homes against warrantless thermal imaging, the case before us involves the use of a thermal imager to scan the Elkinses' commercial buildings. There is a reasonable expectation of privacy in business premises, yet it is less than the reasonable expectation of privacy enjoyed by the home. *New York v. Burger*, 482 U.S. 691, 699-700 (1987). There is little federal precedent on the thermal imaging of commercial property, and none since *Kyllo*.[6]

---

States v. Myers, 46 F.3d 668 (7th Cir. 1995); *United States v. Pinson*, 24 F.3d 1056 (8th Cir. 1994).

[6] *See United States v. Ishmael*, 843 F. Supp. 205, 211-12 (E.D. Tex. 1994) (holding that warrantless thermal imaging of a commercial building violated the Fourth Amendment); *rev'd*, 48 F.3d 850, 857 (5th Cir. 1995)

building. The doctrine of "manufactured" exigent circumstances does not apply.

To establish that the events observed at 2896 Walnut Grove gave rise to exigent circumstances, then, the government must satisfy a two-part test, demonstrating: (1) a reasonable belief that other persons are inside the building; and (2) a reasonable belief that these persons are likely to destroy evidence of a crime. *See United States v. Bates*, 84 F.3d 790, 796 (6th Cir. 1996); *Sangineto-Miranda*, 859 F.2d at 1512.

As the district court acknowledged, the circumstances here satisfied the first part of the test. Police watched one of the two men from the car enter 2896 Walnut Grove, emerge from it, see the police detaining his companion, and then re-enter the building.

Whether police had a reasonable belief that destruction of material evidence was likely is an issue requiring more detailed consideration. Certainly the police had ample reason to suspect that 2896 Walnut Grove contained material evidence of an illegal drug operation. As discussed in Part V.A. *supra*, they had directly observed marijuana leaves inside the building by peering through the exposed gap around the PVC pipe. They knew that 2896 Walnut Grove was controlled by James Elkins and that marijuana had just been found in one of Elkins's other buildings. They had also received an anonymous tip that Elkins was growing marijuana. The district court held that police did *not* have a reasonable belief that drugs were present, but its conclusion rested on its erroneous exclusion of the officers' observations through the gap. We have reversed this holding of the district court, and also reject its conclusion that police had no reasonable belief that drugs were present.

The district court, however, went on to rule that even if the officers did have a reasonable belief that evidence was inside the building, they did not have a reasonable belief that the person or persons inside would be likely to destroy that

seen marijuana in 2896 Walnut Grove, knew that the building was controlled by the Elkinses, and had discovered a marijuana growing operation in another Elkins-controlled building (139 Scott) earlier that day. Moreover, earlier in the day, while driving with Officer Gary from his home to the Scott Street building, James Elkins had made a cellular phone call to an unidentified person. This suggested that confederates of the Elkinses might know that police were investigating them. When the officers saw a car pull up next to 2896 Walnut Grove and one of its passengers enter the building, they had a sufficiently "particularized and objective basis" of suspicion to detain Sandoval, the remaining passenger. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). Thus the detention was lawful.

The fact that the detention of Sandoval appears to have alerted Morales to the presence of police does not render the exigent circumstances doctrine inapplicable. As long as police refrain from unreasonably tipping off suspects, they may use normal investigative and law enforcement measures in the vicinity of a suspected crime location without forfeiting their ability to perform a warrantless search to secure evidence if exigent circumstances arise. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 504 (6th Cir. 2002) ("[T]he created-exigency cases have typically required some showing of deliberate conduct on the part of the police evincing an effort intentionally to evade the warrant requirement."). For example, in *Sangineto-Miranda*, the court held that exigent circumstances arose, permitting a warrantless search of an apartment to secure evidence, when police lawfully arrested a dangerous suspect who temporarily left a drug transaction being carried out in the apartment. Though it was clear that the officers reasonably knew when they arrested the first suspect that other suspects in the apartment would expect him to return, the court found that valid exigent circumstances were present. 859 F.2d at 1505, 1512-13. Here, the detention of Sandoval reasonably furthered the police's needs to inquire into the goings-on at 2896 Walnut Grove and to secure the

Courts should avoid unnecessary constitutional questions. *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944); *Bowman v. Tenn. Valley Auth.*, 744 F.2d 1207, 1211 (6th Cir. 1984). We are convinced that the resolution of the Elkinses' case does not depend on whether *Kyllo*'s holding extends to businesses. Therefore we do not reach that issue. We will simply assume for the sake of argument that the district court's ruling was correct. Even if the Fourth Amendment requires excluding the evidence gained here from thermal imaging, which we do not decide, the officers' later in-person searches of the interiors of 139/155 Scott Street, 2896 Walnut Grove, and 146 Neil Street were still proper, as we explain below, making the evidence seized from those locations admissible at trial. Therefore the thermal imaging evidence is immaterial to the ultimate issues in the case and need not be addressed.

### III.

James Elkins challenges the district court's holding that he validly consented to the police search of 139 Scott Street. Elkins argues that his original consent to search did not include 139 Scott, and that any apparent consent he gave later to search that location was coerced and invalid.

The relevant legal principles are summarized in *United States v. Riascos-Suarez*, 73 F.3d 616 (6th Cir. 1996):

> A search may be conducted without a warrant if a person with a privacy interest in the [place] to be searched gives free and voluntary consent. A court will determine whether consent is free and voluntary by examining the totality of the circumstances. It is the Government's burden, by a preponderance of the evidence, to show

---

(rejecting the district court's holding, viewing the thermal imager as a "passive and non-intrusive" device that would not infringe reasonable privacy expectations in either a business or a home) (court of appeals' analysis, as applied to homes, inconsistent with *Kyllo*).

through "clear and positive testimony" that valid consent was obtained. Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.

*Id.* at 625 (citations omitted). We can only reverse the district court's factual finding that James Elkins voluntarily consented if it is clearly erroneous. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998).

The district court did not err in holding that James Elkins was capable of validly consenting to the search. Valid consent may be given by someone with an actual privacy interest in the place to be searched, *Riascos-Suarez*, 73 F.3d at 625, or with apparent authority over that place, *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). Here we need not conduct an apparent-authority analysis because Elkins plainly had actual standing to consent. He was the chief commercial tenant of the 139/155 Scott Street building; his wife was the other. He testified that he carried keys to the building, locked it, kept a good deal of business and personal property there, and visited it. Elkins made sufficient use of these leased commercial premises, and secured them sufficiently, to enjoy a legitimate personal expectation of privacy in them. *See United States v. Mancini*, 8 F.3d 104, 110 (1st Cir. 1993); *United States v. Moscatiello*, 771 F.2d 589, 601 (1st Cir. 1985), *vacated on other grounds by Carter v. United States*, 476 U.S. 1138 (1986).

The government argues that Elkins voluntarily consented to a search of 139 Scott at two different times: during the officers' initial conversation with James Elkins at his house at 1270 Tutwiler, and during their later interactions with him at 155 Scott.

*See Dunn*, 480 U.S. at 304-05. The fact that Bell saw marijuana within the building may therefore be considered in determining whether exigent circumstances later arose permitting a warrantless search of 2896 Walnut Grove.

### B.

Exigent circumstances permitting police to enter a structure without a warrant may arise when evidence of drug crimes is in danger of destruction. *See United States v. Sangineto-Miranda*, 859 F.2d 1501, 1511 (6th Cir. 1988). We review for clear error the district court's factual findings relating to the existence of exigent circumstances. *United States v. Gaitan-Acevedo*, 148 F.3d 577, 585 (6th Cir. 1998). We review its legal conclusions de novo. *Id.*

Here, several of the events that contributed to the possible existence of exigent circumstances were prompted by Morales's observation of the police detaining his companion Sandoval outside the building. Therefore we first ask whether the officers' initial detention of Sandoval was lawful. Police cannot "manufacture" exigent circumstances through unlawful or unreasonable actions, then invoke those circumstances to justify a warrantless entry into a building. *See, e.g.*, *United States v. Buchanan*, 904 F.2d 349, 355 (6th Cir. 1990) (holding that police with no warrant improperly manufactured exigent circumstances to search defendant's house for drugs by walking up to her door with her husband in handcuffs, knocking, and ordering her to open door).

The district court held that the police improperly tipped off Morales that police were on his trail by detaining Sandoval "without probable cause," and that the exigent circumstances doctrine therefore did not apply. 95 F. Supp. 2d at 817 & n.34. We conclude the district court erred. Police needed reasonable suspicion, not probable cause, to detain Sandoval prior to their search of the building. *See Houston v. Clark County Sheriff Deputy*, 174 F.3d 809, 813 (6th Cir. 1999). Such reasonable suspicion was present. The police had

the permissibility of the observation. *Dow* merely stated in dictum that looking at business premises with "unique sensory device[s]" that "could penetrate the walls of buildings" might be a search requiring a warrant. 476 U.S. at 238. Officer Bell used no "unique sensory device" to "penetrate the walls" of 2896 Walnut Grove; he simply looked through an exposed gap in the wall with his unaided eye.

The Elkinses do have a reasonable expectation of privacy in the interiors of their businesses, but that fact does not insulate those spaces against plain view observation. In *Dunn* the Supreme Court assumed that the barn into which the police peered was protected against warrantless physical entry, but held that it was not a search for the police to shine a flashlight through a net-covered opening above the barn's front gate and scrutinize its interior. 480 U.S. at 304-05.

Any contortions Bell made to peer through the opening did not change the "plain view" character of his observation. The fact "that the policeman may have to crane his neck, or bend over, or squat, does not render the [plain view] doctrine inapplicable, so long as what he saw would have been visible to any curious passerby." *James v. United States*, 418 F.2d 1150, 1151 n.1 (D.C. Cir. 1969). *See also Texas v. Brown*, 460 U.S. 730, 740 (1983) (plurality opinion) (concluding that since "[t]he general public could peer into the interior of [an] automobile from any number of angles[,] there is no reason [an officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen"); *United States v. Pace*, 955 F.2d 270, 273, 275 (5th Cir. 1992) (holding that peering through small opening in the back of locked barn was not a search); *United States v. Wright*, 449 F.2d 1355 (D.C. Cir. 1971) (per curiam) (holding that shining a flashlight through a gap between defendant's closed garage doors was not a search). Since we earlier concluded that Bell also did not violate a Fourth Amendment privacy interest by standing where he stood when he made the observation, his look through the gap was not a search requiring a warrant.

The district court found that at first Elkins specifically consented only to a search of 155 Scott Street. A consensual search is normally limited by the scope of the consent that supports it. *Walter v. United States*, 447 U.S. 649, 656-57 (1980) (plurality opinion). The effective scope of Elkins's consent is not wholly clear, since he responded to the officers' question with a broad remark that they could look "anywhere they wanted to." But in light of the district court's finding, it is doubtful that the search of 139 Scott Street can rest on the consent given at Elkins's home. However, we must also consider the interactions between the officers and James Elkins during the trip to the Scott Street property and on the premises.

There was significant evidence that Elkins voluntarily consented to the search of 139 Scott at this time. Elkins was allowed to drive the officers to Scott Street in his own car. He showed the officers through the office rooms in 155 Scott Street. The officers asked Elkins if they could see the 139 Scott part of the building, and he verbally assented. Their testimony, which Elkins did not challenge below, was that he replied "sure." Elkins was not handcuffed at this time. The officers did not draw their weapons while in Elkins's presence. Elkins called to his wife to admit the officers into 139 Scott, and she did so. Inside the building, Elkins showed the officers a ladder that they could use to reach an attic space they wished to inspect. In addition, Elkins's earlier remark at 1270 Tutwiler that the police could search anywhere they wanted sheds light on his later interactions with the officers, suggesting willing cooperation on Elkins's part.

Elkins stated in an affidavit that one of the officers took him by the arm and led him to 139 Scott Street. He also stated that the officers became agitated when they spotted Carol Elkins's car in front of the building, and demanded entry into the building. James Elkins claims that the officers' behavior at this point made him fear for his wife's safety. The district court viewed Elkins's testimony as giving "some indication of coercion," but found that his claim that he feared

for his wife's safety was not justified by objective evidence in the record. 95 F. Supp. 2d at 815. We will not disturb this ruling, which the record supports. A defendant "must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police" in order to invalidate consent. *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995). Such action was not present here.

Next, as the district court observed, the circumstances of this case conclusively demonstrated that James Elkins was aware of his right to refuse consent to a search. On the same day that he agreed to the searches of 139 and 155 Scott, Elkins refused to allow police to search his property at 146 Neil Street.[7]

In light of these circumstances, the district court did not clearly err in finding that the evidence of free and voluntary consent outweighed the suggestion of coercion that it thought James Elkins's testimony might have raised. Even if the conversation between Elkins and the officers at the Elkins home did not establish consent to search 139 Scott, the later events at Scott Street did. Hence the illegal drugs and other evidence discovered in the building are admissible.

---

[7]Another factor in evaluating a party's knowledge of his rights is his past familiarity with the legal system. *Crowder*, 62 F.3d at 788. Here, James Elkins was familiar with the workings of the criminal justice system, having been convicted for three prior felonies. Indeed, his earlier convictions yielded a significant search and seizure litigation. *See United States v. Elkins*, 732 F.2d 1280 (6th Cir. 1984) (affirming conviction in Fourth Amendment case involving drug activity on James Elkins's premises). This too supports finding voluntary consent.

Amendment is not violated when police walk into parts of a business that are knowingly exposed to the public. *United States v. Morton*, 17 F.3d 911, 913 (6th Cir. 1994).

The area next to the PVC pipe at issue in this case was accessible to the public. Bell ventured onto a "path apparently used to gain access to an apartment building behind the Elkins property." *Elkins*, 95 F. Supp. 2d at 804. No gates or fences shielded the area where Bell stood. The area was visible from the street. The Elkinses argue that the path should be treated as protected curtilage, in part because there was a "no trespassing" sign on the 2896 Walnut Grove building. However, this court has recognized that the presence of a no-trespassing sign cannot confer curtilage status on an area that otherwise lacks it. *United States v. Rapanos*, 115 F.3d 367, 373 (6th Cir. 1997) (citing *Oliver v. United States*, 466 U.S. 170, 182 (1984)).

There may be circumstances in which the area adjoining a business structure is sufficiently private to enjoy a protection analogous to a home's curtilage. We hold, however, that even if "business curtilage" is a viable doctrine in this Circuit, it does not apply here. The path next to 2896 Walnut Grove was, for Fourth Amendment purposes, a place which police could enter under the "open fields" doctrine. *See Oliver*, 466 U.S. at 176-180. Therefore Bell was lawfully present next to the PVC pipe and the opening in the east side of 2896 Walnut Grove.

### 2.

The next issue is the permissibility of the look itself. The district court held that when Bell looked into the gap around the pipe, he violated the Elkinses' reasonable expectation of privacy in their building's interior. 95 F. Supp. 2d at 821, 822. It cited *Dow* in support, but *Dow* is largely inapposite to

---

*Search and Seizure: A Treatise on the Fourth Amendment* § 2.4(b), at 536 (3d ed. 1996).

way, we ask whether the Fourth Amendment prohibited Bell from walking up to the pipe. The Elkinses argue that the officers crossed into a zone of protected "curtilage" in order to peer through the hole. The district court's analysis of this issue was somewhat opaque. It did not separate the curtilage question from the question whether Bell's look through the gap, once he was in place, was in itself a search. The court's discussion did, however, cite *Dow Chem. Co. v. United States*, 476 U.S. 227 (1986). *Dow* stated that it was an open question whether business structures may have a "curtilage" protected against warrantless physical entry; the facts of the case did not require the Supreme Court to decide that question. *Id.* at 239 n.7.

Neither has this court decided whether there are circumstances in which the area adjoining a business structure is protected against physical entry like the curtilage of a home. There is precedent for such a view, *see United States v. Swart*, 679 F.2d 698, 701 (7th Cir. 1982), and for the contrary view, *see, e.g.*, *United States v. Wolfe*, 375 F. Supp. 949, 958 (E.D. Pa. 1974) ("[T]he concept of curtilage does not apply to buildings other than dwellings."); *People v. Janis*, 565 N.E.2d 633, 638-39 (Ill. 1990) (same).

Whatever curtilage protection a business may receive in light of *Dow* is presumably limited by the Supreme Court's later decision in *Dunn*, which held that police were entitled to cross a barbed-wire fence and approach to the very edge of the defendant's barn in order to peer within using flashlights. *See* 480 U.S. at 297-98; *id.* at 302 (noting that barn "was not being used for intimate activities of the home"). Moreover, it is clear that areas that adjoin a commercial building but are accessible to the public do not receive curtilage-like protection.[12] Indeed, even inside a building, the Fourth

---

[12]The leading treatise states: "If police using the naked eye or ear are able to see or hear [objects or events inside a business] while located on adjoining property or even on property of the business which is readily accessible to the general public, this is not a search." 1 Wayne R. LaFave,

## IV.

The Elkinses argue next that the district court erred by holding that the warrant affidavit for 146 Neil Street,[8] as redacted by the court after the evidentiary hearing, established probable cause to search that building. We conclude the district court correctly upheld the affidavit and search.

At an evidentiary hearing held pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), the hearing court must strike from the warrant affidavit statements that the defendant can prove by a preponderance of the evidence to be both (a) materially false and (b) made with reckless or intentional disregard for their falsity. If the redacted affidavit, purged of recklessly[9] and materially false statements, no longer establishes probable cause, then the court must hold the resulting search warrant invalid. *Id.* at 155-56.

We review for clear error the district court's findings about the truth or falsity of statements in the affidavit, and about the reckless character of any falsehoods. *See United States v. Ayen*, 997 F.2d 1150, 1152-53 (6th Cir. 1993). We review materiality de novo. *United States v. Ippolito*, 774 F.2d 1482, 1484 (9th Cir. 1985). At the same time, we examine the statements in the affidavit in light of settled canons for the judicial review of warrant affidavit language. Such affidavits "are normally drafted by non-lawyers in the midst . . . of a criminal investigation," and should be interpreted in "a commonsense manner," not by imposing "[t]echnical requirements of elaborate specificity." *United States v. Pelham*, 801 F.2d 875, 877 (6th Cir. 1986) (quoting *United States v. Ventresca*, 380 U.S. 102, 108, 109 (1965)). Minor discrepancies in the affidavit may reflect mere inadvertence

---

[8]The text of the affidavit is reproduced in the district court's opinion. 95 F. Supp. 2d at 828 n.46.

[9]Reference to "recklessness" here and in the remainder of this opinion should be understood to encompass intentional disregard as well.

or negligence, rather than the reckless falsehood that is required for exclusion. *See United States v. Searcy*, 181 F.3d 975, 980 (8th Cir. 1999).

We consider the challenged statements in the affidavit for 146 Neil Street individually. We begin with the statement in the affidavit that police searched 139 Scott with James Elkins's consent and found "a large indoor marijuana grow room along with . . . [two] pounds of marijuana" within it. In Part III of this opinion, *supra*, we uphold the district court's conclusion that James Elkins validly consented to the officers' search of 139 Scott Street. Thus, the district court properly permitted the incriminating items discovered in the 139 Scott search to be included in the affidavit to search 146 Neil Street. This statement will remain.

The affidavit further reports that 146 Neil Street is "behind" 139 Scott Street, where drugs had been found. More precisely, as the district court found, and as the Elkinses emphasize, 146 Neil is to the rear and at an angle to 139 Scott. Another building, 154 Neil, is directly behind 139 Scott. The district court deemed this discrepancy immaterial. The materiality question is close, but the language in the affidavit properly conveys that 146 Neil is in close proximity to the drug location at 139 Scott. Moreover, the affidavit also speaks of 146 Neil as being "in the rear" of 139 Scott, and this is accurate: the Elkinses' own exhibits show that 146 Neil lies to the back of 139 Scott Street. A stairway attached to 139 Scott apparently overlooks the back of 146 Neil. Warrant language may fall short of technical exactitude without necessarily violating the materiality and scienter requirements of *Franks*. *See Pelham*, 801 F.2d at 877. In this context, we hold that the discrepancy does not establish the reckless or intentional falsehood required by *Franks*, even if we assume that the affidavit language is materially false, which is not at all obvious. Therefore the district court permissibly allowed this statement to remain.

justified a warrantless entry into the building to prevent the destruction of evidence. We are persuaded by the government in both respects, and reverse the district court's holding that the warrant was invalid.

### A.

It is settled that observations of "objects falling into the plain view of an officer who has a right to be in the position to have that view . . . may be introduced in evidence." *Harris v. United States*, 390 U.S. 234, 236 (1968) (per curiam); *see also Horton v. California*, 496 U.S. 128, 135-37, 140-42 (1990) (holding that *seizure* of plain-view items also requires officer to have lawful access to the items). Applying this principle, the Supreme Court held in *United States v. Dunn*, 480 U.S. 294 (1987), that police who used a flashlight to look through a net-covered opening in the defendant's barn, revealing evidence of drug manufacturing within, did not thereby conduct a "search." *Id.* at 305. The Court reached this conclusion even though police had to enter the defendant's property and cross several fences to reach the barn, and even though the Court assumed that the interior of the barn was itself protected against warrantless entry under the Fourth Amendment. *See id.* at 297-98, 303. The Court determined that when the officers looked into the barn's interior, they stood in an area that fell under the so-called "open fields" doctrine, not in the protected curtilage about the defendant's home. *Id.* at 300-01. It followed that "the fact that the objects observed by the officers lay within an area that we have assumed, but not decided, was protected by the Fourth Amendment" did not transform the scrutiny into a search. *Id.* at 304-05. *Harris* and *Dunn* guide our reasoning here.

### 1.

We begin by asking whether Officer Bell had "a right to be in the position" where he was when he peered through the opening in the east side of 2896 Walnut Grove. Put another

activity in 146 Neil (since the tip dealt with the building behind 155 Scott, and 146 Neil was sufficiently behind 155 Scott to be encompassed by the tip); (2) they had found marijuana and growing equipment in nearby 139 Scott; (3) James Elkins owned both 139 Scott and 146 Neil; (4) Elkins consented to a police search of 146 Neil but then withdrew his consent, saying that a search would make things harder for him; and (5) there was a pallet outside 146 Neil containing sheep manure fertilizer, which is commonly used to fertilize marijuana. The district court did not err in holding that this redacted affidavit established probable cause for the police to search 146 Neil Street. It raised "a fair probability that contraband or evidence of a crime," possessing or growing marijuana, would be found there. *United States v. Graham*, 275 F.3d 490, 501-02 (6th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

V.

The United States challenges the district court's decision to suppress the evidence taken from 2896 Walnut Grove. The district court held that Officer Bell violated the Elkinses' expectation of privacy in 2896 Walnut Grove by walking up to the hole around the exposed PVC pipe and peering into it without "sufficient probable cause and exigent circumstances." 95 F. Supp. 2d at 824. It also held that the police's warrantless entry to secure the building was illegal. *Id.* at 818. Evidence gained through these two actions formed the backbone of the warrant affidavit the police later submitted to search 2896 Walnut Grove, so the court went on to hold the resulting warrant invalid, stating that the affidavit, once redacted, "show[ed] no link between Elkins and 2896 Walnut Grove." *Id.* at 825-26.

The government argues for reversal on all points. First, it claims that the police lawfully observed marijuana plants inside 2896 Walnut Grove by peering through a gap around a PVC pipe that projected from the wall of the building. Second, it claims that exigent circumstances later arose that

That conclusion, in turn, throws light on another portion of the affidavit. The affidavit also states that police were investigating "an indoor marijuana grow complaint at 139 Scott . . . and 146 Neil." The Elkinses argue that there is no evidence in the record that police received a complaint about 146 Neil Street. The district court did not explicitly discuss the Elkinses' arguments, but did not strike the statement from the affidavit. Its decision not to do so appears to follow from two conclusions reached in its opinion. First, the court found as a fact that police received an anonymous complaint about a marijuana growing operation in 155 Scott (the same building as 139 Scott) and the building behind it. This finding is supported by the testimony of Officer Cicinelli and is not clearly erroneous in light of the other record testimony. Second, as discussed above, the court concluded that it was not improper, for *Franks* purposes, for the officers to speak of 146 Neil as being behind 139/155 Scott. Hence this statement too remains.

Next, the affidavit states that the police asked James Elkins for consent to search 146 Neil Street; that Elkins consented; and that he then "decided not to give consent[,] advising that [doing so] would only make things harder for himself." James Elkins contests whether he made the statement that searching 146 Neil would make things harder for himself. If Elkins did not make the statement, including in the affidavit the claim that he did would surely violate *Franks*. The district court, however, retained this portion of the affidavit. The inclusion of this incriminating statement is supported by the testimony of Officers Gary and Hoing. The district court's apparent finding that Elkins made the statement is not clearly erroneous.

The affidavit further states that 139 Scott and 146 Neil are "owned by James Elkins." In fact, James Elkins was a tenant of both properties, leasing them from corporations controlled by his wife. The district court, however, found this discrepancy did not violate *Franks*. 95 F. Supp. 2d at 828. James Elkins, it found, held himself out to the police as one

who had control over the properties, and hired the security guards who patrolled the properties. *Id.* The court found that the statement in the affidavit reflected the facts as the officers understood them to be, *id.*, implying that it was not a reckless falsehood. This finding was not clearly erroneous, so the statement remains.

Next, the affidavit states that the officers spotted, "behind 146 Neil and next to 139 Scott Street," a pallet that contained some "bags of sheep manure . . . which is used in the growing of marijuana." At the *Franks* hearing, the government presented expert testimony stating that sheep manure is indeed so used. The district court retained the statement, paraphrasing it as a statement that the pallet was "outside" 146 Neil Street. The Elkinses challenge this holding on appeal, claiming that the sheep manure fertilizer was closer to the nearby building at 137 Scott Street than it was to 146 Neil. Because the Elkinses did not present this argument to the district court, it is not properly before us for consideration. *See United States v. Edge*, 989 F.2d 871, 876 (6th Cir. 1993) (per curiam). This statement also remains.

Finally, the affidavit included a statement that police had received "information from a C/I [i.e., confidential informant] that Elkins [was] growing marijuana in . . . 146 Neil." The district court found that the police had actually received an *anonymous* tip that marijuana was being grown in 155 Scott Street and "the building behind Scott Street." 95 F. Supp. 2d at 801. Treating the affidavit's specific reference to 146 Neil Street as justifiable in light of the tip's reference to "the building behind" 155 Scott Street, the district court nevertheless held that the reference to a "confidential informant" in the statement was recklessly misleading and struck it, since in fact police had only received a tip from an anonymous caller. 95 F. Supp. 2d at 829. We uphold this ruling. The district court permissibly found that the police did not know the identity of the informant who complained about the Elkinses' property. The phrase "confidential informant," however, implies a tipster whose identity *is* known to the

police. That is what is kept "confidential." The district court did not err in deeming this discrepancy material. Tips from known informants have more value than those from unknown ones. *Compare Adams v. Williams*, 407 U.S. 143 (1972) (upholding *Terry* stop based solely on tip from known informant), *with Florida v. J.L.*, 529 U.S. 266, 270 (2000) (invalidating *Terry* stop based solely on tip from anonymous informant; noting that an anonymous informant cannot be "held responsible if her allegations turn out to be fabricated"). The distinction is relevant whenever tips are at issue in a warrant application. It should be readily familiar to police officers, so disregarding it suggests recklessness. For these reasons the court did not clearly err in excluding from the affidavit the reference to the existence of a confidential informant, while retaining the part of the statement that referred to an (anonymous) complaint of drug activity in 146 Neil.

The question then comes down to whether the redacted affidavit established probable cause.[10] While in normal circumstances a warrant affidavit's sufficiency is assessed with "great deference by . . . reviewing courts," *Pelham*, 801 F.2d at 877 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)), we will review de novo the sufficiency of the affidavit here, since at least one portion of it has been validly redacted as recklessly and materially false. *See United States v. Morehead*, 959 F.2d 1489, 1498 (10th Cir. 1992); *see also United States v. Palladino*, No. 92-4360, 1994 WL 369139, at *2 (6th Cir. July 13, 1994) (unpublished opinion). The redacted affidavit[11] included at least the following information supporting a warrant to search 146 Neil: (1) police had received an anonymous complaint of drug

---

[10]The district court entered contested *Franks* rulings on other statements in the affidavit, but we need not consider them.

[11]As previously noted, we ignore the thermal imaging evidence that the district court struck from the affidavit, though we do not decide whether this evidence was correctly excluded.