No. 89,011

STATE OF KANSAS, *Appellee,* v. STEVEN M. IBARRA, *Appellant.*

147 P.3d 842

Opinion filed December 8, 2006.

*Rick Kittel,* assistant appellate defender, argued the cause and was on the brief for appellant.

*Ernest H. Richardson,* county attorney, argued the cause, and *Thomas V. Black,* former county attorney, and *Phill Kline,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Steven Manuel Ibarra was convicted by a jury of manufacture or attempted manufacture of methamphetamine, illegal possession of ephedrine or pseudoephedrine, possession of methamphetamine with intent to sell, and possession of drug paraphernalia. Ibarra appealed. In *State v. Ibarra,* No. 89,011, an unpublished opinion filed August 15, 2003, the Court of Appeals affirmed in part, reversed in part, and remanded. This court granted the State's petition for review and Ibarra's cross-petition for review.

The facts are not in dispute.

One early morning, police stopped Ibarra for lack of a light on his license plate. The officers smelled a strong odor emanating from the vehicle, which they both recognized as ether. When the officers inquired about the source of the odor, Ibarra told them he did not notice it and suggested it could be coming from his work clothes. The officers asked him to get his work clothes, and Ibarra gave them a jacket from inside the vehicle. The strong odor of ether continued to come from the vehicle's interior after the jacket had been removed.

The officers associated the smell of ether with the manufacture of methamphetamine. They communicated with a detective to confirm that they had probable cause to search Ibarra's vehicle. Behind the driver's seat, the officers discovered a black bag in which they found a glass jar containing a white powdery substance. The detective went to the scene and performed field testing on the white substance, which tested positive for methamphetamine. Ibarra was arrested, and the officers obtained a search warrant for the remainder of the vehicle.

On Ibarra's person, officers found several small baggies wrapped in foil and a receipt for three packages of allergy tablets that had been purchased the previous day. Among the items found in Ibarra's vehicle were a butane torch, a fireproof safe containing a gun and ammunition, a microwave oven, four rolls of paper towels, a container of Liquid Fire drain cleaner, a rubber hose, plastic tubing, an unopened box of Sudafed cold tablets, and another receipt for three boxes of cold medication that also had been purchased the previous day.

Ibarra was tried and found guilty by a jury on the following charges:

Count I    manufacture or attempt to manufacture methamphetamine;

Count II    possession of ephedrine or pseudoephedrine with intent to use as a precursor to an illegal substance;

Count III    possession of methamphetamine with intent to sell or distribute; and

Count IV    possession of drug paraphernalia with intent to use to manufacture, compound, convert, produce, process, prepare, test or analyze, pack, repack, sell, or distribute a controlled substance.

Ibarra was sentenced to 120 months on each of Counts I and II, 15 months on Count III, and 11 months on Count IV. The sentences were run concurrently for a controlling sentence of 120 months.

The Court of Appeals held that it was clearly erroneous for the trial court to fail to provide separate jury instructions for manufacture of methamphetamine and attempt to manufacture methamphetamine and error to bundle the two separate and distinct offenses together in the verdict form. As a result, the Court of Appeals reversed and remanded Count I for a new trial. The Court of Appeals also held that because defendant's conduct of illegal possession of ephedrine or pseudoephedrine was punishable under both K.S.A. 65-7006(a), a severity level 1 drug felony statute under which he was convicted, and K.S.A. 65-4152(a)(3), which prohibits possession of drug paraphernalia and is a severity level 4 drug felony, he was subject only to the lesser sentence. The case was remanded for resentencing on Count II. The State petitioned for review of these two rulings. However, at oral argument the State abandoned its appeal as to both rulings, acknowledging as to the latter that *State v. Campbell*, 279 Kan. 1, 106 P.3d 1129 (2005), controls sentencing.

The Court of Appeals concluded that Ibarra's convictions of illegal possession of ephedrine or pseudoephedrine and manufacture or attempted manufacture of methamphetamine were not multiplicitous, that jury unanimity was not required for possession of ephedrine or pseudoephedrine, that there was sufficient evidence to support Ibarra's convictions of manufacture or attempted manufacture of methamphetamine and possession of ephedrine or pseudoephedrine, and that the trial court properly denied Ibarra's motion to suppress. Ibarra cross-petitioned for review of these four rulings.

We first address whether the trial court erred in denying Ibarra's motion to suppress evidence. Additional facts will be developed in the discussion of this issue.

When a motion to suppress evidence is filed, the State bears the burden of proving to the trial court the lawfulness of the search and seizure. Where the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which the court has unlimited review. *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003).

The testimony considered by the trial court in ruling on Ibarra's motion to suppress was given principally at the preliminary hearing. Brief additional testimony was given by Detective Jeff Ward at the hearing on the motion to suppress. The evidence showed:

On September 6, 2001, Deputy James White of the Pratt County Sheriff's Department heard a report from a Barber County deputy of a vehicle speeding northbound on Highway 281. Pratt County lies north of Barber County. Pratt County Deputy Chris Tedder also heard the report, and he stopped a black Blazer. White arrived at the scene to back up Tedder.

When Tedder saw the vehicle and stopped it, it was not speeding. He stopped it because the light illuminating the license tag was out. Tedder told Ibarra, who was driving the vehicle, that the stop was because he had been reported speeding through Sawyer and his tag light was out.

White noticed a very strong odor of ether, which he knew from his training was one of the products used in the production of methamphetamine. He recognized the odor of ether because he was familiar with it from working at a co-op and from having to use it to start his 1963 Corvair. Because he detected the strong smell of ether prior to standing right next to the vehicle which had just been stopped and none of the vehicle windows were rolled down, White ruled out the possibility that the ether had been used to start the vehicle.

Tedder was familiar with the use of ether in the manufacture of methamphetamine and the smell of ether from his law enforcement training. He thought the smell was coming from inside the vehicle. Tedder observed nothing else that was indicative of a methamphetamine laboratory.

Tedder and White went back to Tedder's vehicle and conferred about the odor. Tedder contacted Detective Ward and asked if they had probable cause to search Ibarra's vehicle. Basing his decision on the odor of ether coming from the vehicle, Ward told Tedder that there was probable cause to search the vehicle.

White approached Ibarra and told him how strong the odor of ether was. Ibarra denied smelling it. White asked if there was any reason why he smelled ether, and Ibarra said he believed the smell could be on his work clothes or work jacket. Ibarra got a jacket out of the vehicle for White to smell. According to White, the jacket had an odor of ether, but it did not reek of ether like the vehicle did. After being out of the vehicle for awhile, the jacket "aired out and smelled normal."

Tedder asked Ibarra to get out of his vehicle. The officers asked Ibarra for consent to search his vehicle, and he refused. After having the passenger get out of Ibarra's vehicle, White opened the driver's door and began searching the interior of the car. Inside a black bag on the floorboard behind the driver's seat, he found a glass container with white powder in it. He believed it was the product of a methamphetamine laboratory.

Tedder contacted Ward, who came to the scene and field tested the contents of the glass container. It tested positive for methamphetamine. Ibarra was arrested. While White and Tedder stayed with the vehicle, Ward obtained a search warrant. A further search of the vehicle was conducted by Ward after he got the search warrant.

White testified that, even before Ibarra was arrested, he was not free to get back into his vehicle and drive off. Tedder, too, testified that, before Ibarra was arrested, he was being detained and that he was not free to leave.

At the suppression hearing in the trial court, defense counsel argued that, with Ibarra detained, there was nothing to prevent the officers from getting a search warrant before searching the vehicle. The State argued that it was irrelevant that Ibarra was detained because an officer with probable cause to believe there is evidence of a crime in a vehicle may search it without a warrant and without applying for a warrant. The trial judge concluded that the search

fit within one of the recognized exceptions, probable cause accompanied by exigent circumstances, to the Fourth Amendment search warrant requirement:

"A strong smell of ether emanating from a motor vehicle in the middle of the night without some other reasonable explanation as to why there's a strong smell of ether emanating from a motor vehicle is in this Court's opinion probable cause to conduct a search. A motor vehicle on the side of the road late at night is exigent circumstances by definition."

In the Court of Appeals, Ibarra argued that the police did not have probable cause to search his car and, hence, that all fruits of the initial search, including the subsequently obtained search warrant, should be suppressed. Ibarra did not question the legality of the initial traffic stop by the police. The Court of Appeals agreed with the trial court's denying the motion to suppress:

"In the present case, the police testified that the odor of ether emanating from Ibarra's car was very strong. Both officers had training regarding the smell of ether and its association with methamphetamine labs. One officer testified that he had experience with the use of ether to start vehicles but that the odor coming from Ibarra's car was considerably stronger than this benign use would normally create. A drug investigator testified that a strong odor of ether is often indicative of methamphetamine manufacture.

"Ibarra also denied smelling odor of ether when asked by the police. He then told the officers the smell could have been coming from his work jacket because he was a mechanic. However, the odor emanating from the interior of Ibarra's car remained strong well after Ibarra removed the jacket from the car.

"Our Supreme Court has held that the odor of marijuana emanating from the interior of a car creates probable cause to search that vehicle. *State v. MacDonald*, 253 Kan. 320, 324-25, 856 P.2d 116 (1993).

"This court has found that the odor of alcohol coming from the inside of a car, combined with evidence of an impaired driver and the driver's denial of alcohol consumption, gave officers probable cause to search that vehicle's interior for an open container. [*State v.*]*Bickerstaff*, 26 Kan. App. 2d [423,] 424[, 988 P.2d 285, *rev. denied* 268 Kan. 889 (1999)].

"In *State v. Blair*, 31 Kan. App. 2d 202, 62 P.3d 661 [2002], this court dealt with the smell of ether. The *Blair* court pointed out that '[a]lthough ether is used in the manufacture of methamphetamine, it is not illegal to possess it' and found the police did not have probable cause to search Blair's home and garage. 30 Kan. App. 2d at 208.

"However, the court noted that its decision was based on the location of the search: 'A home does not have *the same mobility as a vehicle to pose a public safety threat to other drivers on the street or to aid in an escape from the police*

. . . .' (Emphasis added.) 30 Kan. App. 2d at 208. The police in the present case testified that they had concern for others' safety in making the decision to search Ibarra's car.

"Here, the odor of ether coming from Ibarra's car was strong, and Ibarra failed to present a viable reason for its presence. In fact, Ibarra attempted to deny the odor existed. The car had been speeding [along] a rural highway in the early morning hours. Finally, the volatile nature of the ingredients associated with the manufacture of methamphetamine does present a unique threat to others using the same streets and highways. As a result, exigent circumstances existed which provided officers with probable cause to conduct the warrantless search of Ibarra's car. The trial court did not err in denying Ibarra's motion to suppress." Slip op. at 16-18.

In his petition for review, Ibarra renews his argument that the odor of ether did not give probable cause to search his vehicle. He distinguishes the present case from *MacDonald* on the ground that the odor of marijuana in the latter was the odor of a controlled substance but the odor of ether is the odor of a legal substance. Moreover, he argues, there was nothing unusual about the odor of ether emanating from a vehicle because, as attested by Deputy White, ether is commonly used to start engines.

Unreasonable searches are constitutionally prohibited. "Unless a search falls within one of a few exceptions, a warrantless search is per se unreasonable." *State v. Canaan*, 265 Kan. 835, Syl. ¶ 1, 964 P.2d 681 (1998). A warrantless search is permissible where there is probable cause for the search *and* exigent circumstances justify an immediate search. *Boyd*, 275 Kan. 271, Syl. ¶ 3. The trial court was very clear in stating that the strong odor of ether without a legitimate explanation constituted probable cause and the late hour and mobility of the vehicle constituted exigent circumstances.

The Court of Appeals relied on several questionable factors—(a) the speeding vehicle and (b) the volatile nature of chemicals associated with the manufacture of methamphetamine. First, there was no evidence that Ibarra was speeding at the time he was stopped, and none of the officers who testified had seen Ibarra speeding. The officers testified that they had received a communication from a law enforcement officer in another county saying that a black Blazer had sped through the town of Sawyer. The testifying officers seemed to assume that Ibarra's vehicle was the

one that sped through Sawyer, but there was no effort to prove the assumption. Second, the officers who testified with regard to the stop and search did not express concern about the volatile nature of chemicals associated with methamphetamine production presenting a threat to themselves or other persons on the streets and highways.

The *Ibarra* Court of Appeals also erased the distinction between probable cause and exigent circumstances, stating that "exigent circumstances existed which provided officers with probable cause." Slip op. at 18. The exception to the requirement of having a lawfully issued search warrant that is at issue in this case is probable cause to search *plus* exigent circumstances. See *State v. Mendez*, 275 Kan. 412, 421, 66 P.3d 811 (2003) (quoting *State v. Baughman*, 29 Kan. App. 2d 812, 814, 32 P.3d 199 [2001]).

The Court of Appeals' reasoning for affirming the district court's denial of Ibarra's motion to suppress the evidence was faulty.

The trial court's ruling frames the issue before this court: Does the strong odor of ether emanating from the interior of a vehicle without a legitimate explanation constitute probable cause to search and, if so, does the late hour and potential mobility of the vehicle constitute exigent circumstances? This is the first time a Kansas appellate court has considered the question whether the strong odor of ether emanating from a vehicle can constitute probable cause to search.

The Court of Appeals cited three Kansas cases involving issues related to the one before the court. In *State v. MacDonald*, 253 Kan. 320, Syl. ¶ 2, 856 P.2d 116 (1993), the court held, in accord with a majority of courts, that marijuana odor detected by a law enforcement officer can constitute probable cause to support a warrantless search. In *MacDonald*, the odor of burned marijuana inside a car provided probable cause to search the car. "The marijuana odor provided the basis for the suspicion that a crime had been committed and that evidence in connection with the crime was located within the automobile." 253 Kan. at 325. The odor perceived by the officer in *MacDonald* was of marijuana, which is a controlled substance, and the "evidence in connection with the

crime" that the officer suspected was located in the car was also marijuana.

The odor of alcohol was at issue in *State v. Bickerstaff*, 26 Kan. App. 2d 423, 988 P.2d 285, *rev. denied* 268 Kan. 889 (1999). After stopping Bickerstaff for speeding, the officer smelled the odor of alcohol on Bickerstaff and emanating from the interior of her vehicle. Bickerstaff denied that she had been drinking and denied consent to any search. Field sobriety tests and a breath test convinced the officer that Bickerstaff had alcohol in her system but was not impaired. The Court of Appeals concluded that the odor of alcohol from the person and her car *and* the breath test showing she had alcohol in her system *coupled with* her denial of drinking provided the officer with probable cause to conduct a warrantless search of the vehicle for an open container. 26 Kan. App. 2d at 424. Without mentioning exigent circumstances, the Court of Appeals reversed the trial court's order granting Bickerstaff's motion to suppress. 26 Kan. App. 2d at 424-25.

The odor of ether emanating from the garage of a residence was at issue in *State v. Blair*, 31 Kan. App. 2d 202, 62 P.3d 661 (2002). Police received a Crimestoppers' call about a strong odor of ether emanating from Blair's residence. When an officer went to the house and parked 75 to 100 feet away, he could smell ether. Walking to the residence, he noticed a gray cloud coming from under the garage door, which was propped open approximately 1 to 1½ feet with a small television set. Based on his training, the officer suspected there was a methamphetamine laboratory in the garage. He knocked on the garage door but got no answer. He then went to the front door of the residence. Blair came to the front door. The officer said he needed to look in the garage to investigate the odor complaint. Blair declined and said that he was doing refrigerator work in the garage. Blair asked at least twice whether he could call an attorney. After talking to Blair for 4 to 5 minutes, the officer told Blair that he and the other officers were going to have to enter the residence to find out what the source of the odor was. Blair finally let them in. They walked through the house, finding incriminating items in plain view, and entered the garage through an interior door. Before they entered the house, the only evidence

officers had to support their suspicion that defendant was committing the crime of manufacturing methamphetamine in his garage was the smell of ether coming out of it. Discussing both parties' reliance on *MacDonald*, the Court of Appeals stated:

"The officers in this case could have attempted to obtain a search warrant to search the residence and the garage before entering either one, instead of them entering the residence without a warrant. . . . Although ether is used in the manufacture of methamphetamine, it is not illegal to possess it. A home does not have the same mobility as a vehicle to pose a public safety threat to other drivers on the street or to aid in an escape from the police . . . ." 31 Kan. App. 2d at 207-08.

The Court of Appeals held that the strong odor of ether emanating from the garage did not by itself give rise to probable cause. 31 Kan. App. 2d 202, Syl. ¶ 3.

Cases in accord with *Blair* are discussed in Annot., *Validity of Warrantless Search Based in Whole or in Part on Odor of Narcotics other than Marijuana, or Chemical Related to Manufacture of Such Narcotics*, 115 A.L.R.5th 477. One of the annotated cases is from the United States District Court for the District of Kansas, *United States v. Jackson*, 199 F. Supp. 2d 1081 (D. Kan. 2002). In *Jackson*, despite a law enforcement officer's detection of a strong odor of anhydrous ammonia, which is associated with methamphetamine production, and suspicion that methamphetamine was being produced in the residence, the prosecution failed to prove the existence of exigent circumstances at least in part because no testimony was offered regarding the danger of explosion or volatility of methamphetamine. In the present case, the State offered no testimony about what the Court of Appeals characterized as "the volatile nature of the ingredients associated with the manufacture of methamphetamine," which "present[ed] a unique threat to others using the same streets and highways." *Ibarra*, slip op. at 18.

Here, it appears that in adding Ibarra's speeding and the volatility of chemicals associated with methamphetamine production to the reasons given by the trial court for finding an exception to the search warrant requirement, the Court of Appeals had in mind a public safety threat. The record does not support including these factors for consideration, but, even if it did, the following discussion from *Blair* of the emergency doctrine exception to the search war-

rant requirement indicates that, as in *Blair*, the doctrine would not be applicable in the circumstances of the present case:

"A three-prong test for analyzing the applicability of the emergency doctrine exception has been adopted by the Kansas courts:

'(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

'(2) The search must not be primarily motivated by intent to arrest and seize evidence.

'(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.' " *Jones*, 24 Kan. App. 2d [405] at 413[, 947 P.2d 1030 (1997)] (quoting *People v. Mitchell*, 39 N.Y.2d 173, 177-78, 383 N.Y.S.2d 246, 347 N.E.2d 607 [1976]).

"Cox's own testimony shows he was more interested in Blair's possible connection with illegal activities relating to drug use or the manufacturing of methamphetamine than rendering assistance for the protection of life or property. Cox stated he wanted to enter the garage to find out what was going on for the safety of the neighbors; however, the officers never warned the neighbors or called the fire department. Cox was obviously motivated to arrest Blair and seize evidence from his garage and house because Cox would not let Blair go back inside the house to open the garage door fully. The facts show the primary motive of the police was to search for evidence of a crime in the garage. See *Jones*, 24 Kan. App. 2d at 414 (although the possibility of criminal activity might account for the feared danger in a given case, the primary motive of the police will not be to search for evidence of a crime but rather to render assistance). The emergency doctrine does not apply under the facts of this case." *Blair*, 31 Kan. App. 2d at 208-09.

Here, there was no evidence that the police had reasonable grounds to believe that there was an emergency at hand and an immediate need for their assistance for the protection of life or property. Moreover, it is apparent from the evidence that the officers' primary motive was to search the vehicle for evidence of a crime.

The previously cited annotation also identifies a few cases in which detection of an odor of a legal substance associated with controlled substances was involved in officers' decisions to conduct a warrantless search of a vehicle. 115 A.L.R.5th at 496-507. In none of the annotated cases, however, does odor alone constitute probable cause for a search. For example, in *United States v. Martin*, 238 F. Supp. 2d 714, 715 (D. Md. 2003), an officer stopped a

vehicle for erratic driving and then smelled a strong odor of cleanser or detergent, which presumably was used to mask drug odors. There were a number of additional and significant factors contributing to the officer's decision to search, though, including a moderate odor of alcohol, an open bottle of malt liquor, a small metal scale, and marijuana in plain view. In *United States v. Lopez*, 777 F.2d 543, 546 (10th Cir. 1985), when a driver at a roadblock stop rolled the window down, a police officer detected a strong smell of ether coming from the interior of the vehicle. The officer asked for permission to search the vehicle, and the driver consented. In *United States v. West*, 219 F.3d 1171, 1174-75 (10th Cir. 2000), an officer stopped a speeding vehicle. The driver was very nervous, and his hands were shaking. The officer smelled a distinctive odor of air freshener, which he suspected was being used to mask the odor of a controlled substance. A check of the driver's documents showed that he had a criminal record, and he continued to shake very visibly. The officer asked for permission to look inside the vehicle, and the driver consented.

In a very recent Missouri case, *State v. Mahsman*, 157 S.W.3d 245 (Mo. App. 2004), consideration was given to whether the information in a search warrant affidavit, which included a jar of ether on the premises, sufficed to show probable cause. In addition to a jar of ether being found by officers on the walkway outside of Mahsman's residence, the affidavit stated that he had burst into his neighbor's house waving a handgun and shouting that the world was coming to an end and that weapons were observed in plain view during a sweep of his house. The Missouri Court of Appeals concluded that the affidavit did not provide probable cause for issuance of a search warrant. From other cases involving ether, the Court of Appeals drew the principle that the presence of ether *coupled with other incriminating evidence* could provide probable cause. 157 S.W.3d at 251-52. Because neither Mahsman's lawful possession of weapons nor his bizarre behavior supplied other incriminating evidence, his motion to suppress was wrongly denied. 157 S.W.3d at 253. The presiding judge dissented from the majority's holding that the affidavit information was insufficient. 157 S.W.3d at 253-55 (Ahrens, J., dissenting). He was of the opinion

that the jar of ether coupled with weapons and bizarre behavior, "[w]hen considered in a commonsense manner," provided probable cause. 157 S.W.3d at 255 (dissent).

In *People v. Stegman*, 164 Cal. App. 3d 936, 942, 210 Cal. Rptr. 855 (1985), the court considered defendant's contention that his neighbor's report of the odor of ether from defendant's house provided neither probable cause nor exigent circumstances justifying a search. The officers who responded to the neighbor's report of the smell of ether "knew ether was a volatile substance, and that there was a danger of explosion and fire." 164 Cal. App. 3d at 940. As they approached defendant's house, the odor of ether became stronger. They could see people inside the residence. They could see plastic vats with a chemical substance in them on the patio and in the house. They could see and hear a vacuum pump in the house and a number of glass beakers. An officer went to the door and announced that he was a sheriff's deputy and commanded the occupants to open the door. The people inside the house immediately began running, and officers arrested them. The California Court of Appeals believed that the "plain smell" of ether was not the justification for a search but was

"a circumstance which justified further investigation. The officers knew that ether is a highly volatile and explosive substance. An odor detectable at a distance of two houses away in a wooded and mountainous area could be of a toxic volume near the source [citation omitted], and although ether is a substance which may have lawful uses, the odor at such a high concentration as to be detected from some distance away is at least as probably consistent with criminal as with innocent activity." 164 Cal. App. 3d at 942.

The California court concluded:

"We need not address defendant's specific contentions that the smell of ether alone does not justify a warrantless search, and that the odor of a noncontraband substance does not supply probable cause for issuance of a search warrant. Neither a search nor a search warrant in the instant case was based solely on the evidence of the ether odor. There was other evidence which, when combined with the smell of ether, established both the exigency for the entry and probable cause for the issuance of the search warrant. As the officers approached the residence, the smell of ether became stronger. The officers saw plastic vats with chemicals outside the house, and when they went up on the porch, they saw, plainly visible through the windows, a vacuum pump, more vats with chemicals, and glass beak-

ers. When the sheriff's deputy knocked on the open door and identified himself, the people inside the house immediately ran. These additional items of evidence justified the entry into the residence, and not the smell of ether alone." 164 Cal. App. 3d at 943.

We have not found and the parties have not cited a single case in which the odor of ether or other legal substance alone justified a search. In *Blair*, the Kansas Court of Appeals rejected the proposition that the smell of ether coming from an attached garage gave rise to probable cause to search the residence. 31 Kan. App. 2d at 207-08. Although the Court of Appeals went on to state that a home is not mobile like a vehicle, the basis for its holding was the lack of probable cause:

"The officers in this case could have attempted to obtain a search warrant . . . instead of . . . entering the residence without a warrant. However, the officers did not have any other supporting evidence to show that Blair was committing the crime of manufacturing methamphetamine in his garage except for the smell of ether coming out of it, and we find that this fact alone did not give rise to probable cause." 31 Kan. App. 2d at 207-08.

The strong odor of ether emanating from a house or a vehicle is as consistent with lawful activity as it is with criminal activity. We agree with the California Court of Appeals that the smell of ether alone is justification for further investigation but not for a search.

As previously noted, a warrantless search is per se unreasonable if it does not fall within one of the search warrant exceptions. In *State v. Mendez*, 275 Kan. 412, 421, 66 P.3d 811 (2003), we stated:

"There are several recognized exceptions to the Fourth Amendment requirement of a lawfully issued search warrant. Most of these are set forth in *State v. Baughman*, 29 Kan. App. 2d 812, 814, 32 P.3d 199 (2001), where Judge Beier opined:

" 'Kansas has previously recognized several exceptions to the Fourth Amendment search warrant requirement: consent; search incident to a lawful arrest; stop and frisk; probable cause to search accompanied by exigent circumstances, of which hot pursuit is one example; the emergency doctrine; inventory searches; plain view; and administrative searches of closely regulated businesses. See *Canaan*, 265 Kan. at 843 (inventory search of impounded automobile; plain view); *State v. Box*, 28 Kan. App. 2d 401, 404, 17 P.3d 386 (2000) (citing *State v. Sanders*, 5 Kan. App. 2d 189, 195, 614 P.2d 998 [1980]) (consent, search incident to arrest, stop and frisk, exigent circumstances, hot pursuit); *State v. Jones*, 24 Kan. App. 2d 405, 410-12, 947 P.2d 1030 (1997) (emergency doctrine recognized in *State*

*v. Jones*, 2 Kan. App. 2d 38, 573 P.2d 1134 [1978]); *State v. Marsh*, 16 Kan. App. 2d 377, 381-87, 823 P.2d 823 (1991) (citing as controlling *New York v. Burger*, 482 U.S. 691, 702-03, 711-12, 96 L. Ed. 2d 601, 107 S. Ct. 2636 [1987]); see also *Steagald v. United States*, 451 U.S. 204, 218, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981) (recognizing hot pursuit exception as one example of exigent circumstances exception); *State v. Riddle*, 246 Kan. 277, 280, 788 P.2d 266 (1990) (same).'

"Another exception is the 'plain feel' corollary to the plain view exception to the Fourth Amendment search warrant requirement which we adopted in *State v. Wonders*, 263 Kan. 582, Syl. ¶ 7, 952 P.2d 1351 (1998)."

Here, the State relied upon probable cause with exigent circumstances. Probable cause must exist to search, whether it is a vehicle or a house. Where probable cause is absent, the existence of exigent circumstances is irrelevant. Here, the officers did not have probable cause to search and, even under exigent circumstances, the warrantless search was unreasonable and thus unlawful.

The dissent would uphold the district court's denial of Ibarra's motion to suppress on the ground that the odor of ether detected by Deputies Tedder and White combined with information provided to Detective Ward by informants constituted probable cause. To reach this conclusion the dissent relies upon matters not addressed by the district court, not addressed by the parties in their arguments, not addressed by the Court of Appeals, and not addressed by Ibarra in his petition for review. We refrain from basing our decision on grounds not addressed by the lower courts or the parties, where the countervailing arguments have not been made and certainly have not been considered.

Moreover, application of the "fellow officer rule" to the circumstances of this case displaces testing of the reliability of the information known by Detective Ward; more specifically there are no findings by the trial court regarding the reliability of the informants. A determination of probable cause should not be based simply upon a determination that there were informants; reliability of the information is a factor. This principle has been discussed by this court in the context of probable cause to arrest in *State v. Clark*, 218 Kan. 726, 731-32, 544 P.2d 1372, *cert. denied* 426 U.S. 939 (1976); the analysis applies equally to considerations of probable cause to search. In *Clark*, the court stated the following principles

regarding the reliability of a source of information for determining probable cause:

"The information upon which a determination to arrest without a warrant is made must be reasonably reliable, and the chain of communication through which facts known to the police are received must be constructed with reliable links from its source to the resulting arrest; this chain of communication must be reliably cohesive from a reliable source to the resulting arrest (*United States v. Dento*, 382 F.2d 361, *cert. denied* 389 U.S. 944, 19 L. Ed. 2d 299, 88 S. Ct. 307; *reh. denied* 389 U.S. 997, 19 L. Ed. 2d 502, 88 S. Ct. 493). There is no requirement that the arresting officer have sufficient firsthand knowledge to constitute probable cause. It is enough that the police officer initiating the chain of communication either had firsthand knowledge or received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth' (*Daniels v. United States*, 393 F.2d 359, 361). Therefore, when an arrest is based on a message relayed over police radio, the question of probable cause is determined upon the full information which caused the message to be sent over the radio and not on the basis of the message alone (see *State v. Dearman*, 203 Kan. 94, 453 P.2d 7). If it later turns out that the officer or agency initiating the chain of communication did not have probable cause to make an arrest, the arrest made by the officer relying on the radio message will be unlawful (*Whitely v. Warden*, 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031)."

The United States Supreme Court decision which served as the basis for this analysis, *Whitely v. Warden*, 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971), "clearly retains relevance in determining whether police officers have violated the Fourth Amendment." *Arizona v. Evans*, 514 U.S. 1, 13, 131 L. Ed. 2d 34, 115 S. Ct. 1185 (1995). The actual form of the analysis in current use—totality of the circumstances—was set out in *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, *reh. denied* 463 U.S. 1237 (1983). In *State v. Toler*, 246 Kan. 269, 272-73, 787 P.2d 711 (1990), the impact of *Gates* was stated as follows:

"Prior to the decision in *Gates*, the courts had followed a two-pronged test to determine whether an affidavit contained probable cause, based upon prior United States Supreme Court decisions in *Spinelli* [*v. United States*, 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969),] and *Aguilar* [*v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964)]. Under this test, the affidavit was required to first show the 'basis of knowledge' by stating the particular means by which the informant received the information given in his report. Second, the affidavit was required to establish either the veracity of the informant or the reliability of the information. *Gates*, 462 U.S. at 228-29. In *Gates*, the Court recognized that the

elements of the two-pronged test are highly relevant considerations in the totality of the circumstances analysis that has traditionally guided a probable cause determination. But, under the totality of the circumstances, a deficiency in one aspect of the two-pronged test is not fatal and may be compensated for by determining the overall reliability of the tip, or some other strong indicia of reliability. Thus, the totality of the circumstances analysis permits a balanced assessment of the relative weights of all the various indicia of reliability and unreliability rather than encouraging an excessively technical dissection of informants' tips under the two-pronged test. *Gates*, 462 U.S. at 234-35."

Hence, veracity and reliability remain highly relevant considerations in the totality of the circumstances analysis.

At the hearing on Ibarra's motion to suppress, Detective Ward described his information and its sources in the following testimony:

"Q. [The prosecutor:] And when that officer called you and told you that he could smell a strong odor of ether coming from Mr. Ibarra's car what other information prior to that, did you have concerning Mr. Ibarra?

"A. Well, I've been receiving information relat[ing] that Mr. Ibarra had been manufacturing methamphetamine, selling methamphetamine for several years.

"Q. And have you received current information within the last 30 to 60 days?

"A. Oh, yes, yes, sir.

"Q. And what kind of information is that, briefly?

"A. I had an informant that had told me that Mr. Ibarra was still involved in the manufacture of methamphetamine and that he had given him, the informant, some.

"Q. And did the—did you—did that informant tell you how Mr. Ibarra, generally, manufactures his Meth or where?

"A. I've had so much information without my file I can't give you the specifics of that contact.

"Q. Okay. Do you recall any conversations with informants involving Mr. Ibarra manufacturing methamphetamine or doing parts of the manufacture inside his vehicle while driving?

"A. Yes, sir.

"Q. And within the last 30 days have any persons been stopped who had portions of a methamphetamine lab in their possession that they claimed were Mr. Ibarra[']s that were given to them for disposal?

. . . .

"THE COURT: As I understand [the prosecutor's] question, he's saying for a period of time starting approximately the first week of September through the date of Mr. Ibarra's arrest is the time frame he's inquiring regarding.

"A. I would have to research my intelligence files to provide, to get that specific.

"Q. Okay. Do you recall information given to you by Cassie Mayes and Jamie Mackney?

"A. Yes.

"Q. And what kind of information was that?

"A. Cassie Mayes had reported to Detective Steve Holmes that she had purchased pseudoephedrine cold tablets that she g[a]ve to Steven Ibarra at Kincheloes. I don't know the date.

"Q. Was it this year?

"A. Yes.

"Q. And was Ms. Mackney picked up with any methamphetamine laboratory parts?

"A. I believe she was, yes, sir.

"Q. And do you know who she claimed those belonged to?

"A. Specifically I don't know, sir.

"Q. Okay. And the information that you had that Mr. Ibarra was manufacturing methamphetamine, or at least doing portions of the manufacture in his vehicle, how old was that?

"A. Without going to my intelligence files I can't give you an exact date.

"Q. Approximately?

"A. It was within the 30 days prior to his arrest.

"Q. And how long have you been getting information concerning Mr. Ibarra's ongoing manufacturing of methamphetamine?

"A. Like I said for the past several years."

Thus, Detective Ward identified Cassie Mayes as the source of information about pseudoephedrine, and that information was that she bought pills and gave them to Ibarra. Even though Detective Ward identified Mayes as the source this information, he did not testify about who she is or why it would seem reasonable to believe she was telling the truth. Additionally, Detective Ward did not identify sources for the information that Ibarra was involved in manufacturing and selling methamphetamine or that Ibarra was doing parts of his manufacturing inside his vehicle while driving. All that is known is that Detective Ward had been told so by un-named persons of unknown reliability.

Although after *Gates* an informant's veracity and reliability no longer are separate and independent requirements for each case, they are still highly relevant. A Texas case, *Long v. State*, 137 S.W.3d 726 (Tex. App. 2004), in which the odor of ether combined with a tip from a *reliable* informant to provide probable cause, contrasts with the present case and serves to illustrate its short-

comings. In the *Long* affidavit supporting the request for a search warrant, Detective Tanner stated why he believed the informant was credible and detailed information he received from the informant and his personal observations while at defendant's residence. On the informant's credibility, Tanner stated: " 'Affiant believes that the information so furnished is true and correct, and that the informant is credible, because said informant has previously furnished information to affiant on at least two or more occasions in Navarro County, Texas, and on each and every occasion, such information has proven true, correct and reliable.' " 137 S.W.3d at 730. The detailed information included the following:

"Detective Tanner has received information from a confidential informant hereinafter referred to as (CI) that Carl Long keeps the equipment to manufacture methamphetamine speed at his residence in a hole in the ground next to the house. The CI said that when Long gets ready to manufacture, he removes the lab equipment from the hole outside the house, takes it into the house and cooks the speed. The CI advised that Carl Long is using the Nazi Lab method to manufacture methamphetamine speed. Detective Tanner has been to the suspected residence within the past two months assisting Detective Jones on a follow up of a arson investigation and Detective Tanner smelled a odor of ether around the southwest corner of the residence. Detective Tanner is familiar that ether is used in the manufacture of Nazi speed. The CI advised Detective Tanner that Long manufactures the speed in the southwest corner of the house which is a bedroom." 137 S.W.3d at 731.

In addition, Tanner stated that the CI had observed methamphetamine being manufactured at Long's house within the previous 48 hours. Thus, probable cause in *Long* was based on Tanner's detecting the odor of ether combined with a reliable informant's detailed knowledge of Long's operation and the informant's current information based on his personal observations of methamphetamine being made by the defendant at his residence. In contrast, in the present case the dissent would find probable cause based on the field officers' detecting the odor of ether combined with the sketchy reports of informants of unknown reliability.

If the dissent's view were to be adopted and the court were to rely on the informants' tips for probable cause where information about their veracity and reliability is seriously deficient, the question is whether the odor of ether detected by the officers on the

scene can lend credence to the information, *i.e.*, corroborate the tips. In *Gates*, for example, where the tip was an anonymous letter, neither the veracity nor basis of knowledge was established. But the facts obtained by independent investigation mirrored the modus operandi described in detail in the letter and were quite suspicious and, hence, combined with an anonymous tip to comprise probable cause. The letter stated that Lance and Sue Gates were drug dealers who lived in a suburb of Chicago and bought drugs in Florida, that Sue drove the car to Florida, and Lance then flew to Florida and loaded the car with drugs worth more than $100,000 and drove back. Investigation and surveillance revealed that the Gates lived in Bloomingdale, a suburb of Chicago, that Lance flew to West Palm Beach, Florida, took a taxi to a motel, went to a room registered to Susan, and early the next morning drove northbound on an interstate highway frequently used by travelers to the Chicago area in a car with license plates registered to a car owned by Gates. Twenty-two hours later, which is the approximate driving time between West Palm Beach and Chicago, and only 36 hours after leaving Chicago, Gates returned to their home in Bloomingdale. Three hundred fifty pounds of marijuana was found in the trunk of the Gates car when it was searched pursuant to a search warrant.

Kansas courts recognize that corroboration in certain circumstances may cure deficiencies in the showing of veracity and basis of knowledge: "In the absence of any evidence establishing the reliability or credibility of the informant, corroboration by an independent police investigation would help establish probable cause. [Citation omitted.]" *State v. Hemme*, 15 Kan. App. 2d 198, 202, 806 P.2d 472, *rev. denied* 248 Kan. 998, *cert. denied* 502 U.S. 865 (1991). But some substantial corroboration, as in *Gates*, is required. In *Hemme*, a named informant's statement attached to the affidavit for a search warrant described purchasing drugs from Hemme at his residence on several occasions and gave the prices. The officer confirmed in the affidavit that the address given by the informant was that of Hemme. The court concluded that confirmation of the defendant's address was not enough to bolster the reliability or credibility of the informant. 15 Kan. App. 2d at 202.

Two Kansas cases involve informants' information and an odor associated with illegal drugs. *State v. Bowen*, 27 Kan. App. 2d 122, 999 P.2d 286 (2000), involves tips and an odor associated with illegal drugs, but it differs from the present case because in *Bowen* the reliability of the named informants was not at issue. Bowen was arrested at his residence pursuant to a warrant that was "drug related but did not involve methamphetamine." 27 Kan. App. 2d at 122. Three months before the warrant was executed, a "usually reliable" named informant told the deputy sheriff that Bowen had offered him methamphetamine at a motel where Bowen lived at that time, and a named undersheriff told the deputy sheriff that Bowen had a background in chemistry and had been known to manufacture methamphetamine. When arresting Bowen at his new residence, the deputy sheriff smelled ether. Bowen explained the odor by saying he was treating a wound on his cat with iodine. The deputy sheriff later learned that iodine may be used in manufacturing methamphetamine, and a search warrant was obtained for the residence.

In *State v. Bowles*, 28 Kan. App. 2d 488, 493, 18 P.3d 250 (2001), the considerable weight of the corroborating factors contrast with the single factor in the present case—the odor of ether. *Bowles* is a case in which a tip was substantially corroborated so as to establish probable cause. A confidential informant had personal knowledge that defendant and his brother had been involved in manufacturing methamphetamine. The informant also had been told by a named person, who the informant personally knew to have manufactured methamphetamine at least four times in the last 2 months and distributed it, that defendant and his brother were producing methamphetamine at defendant's residence. The February 16 affidavit for a search warrant in *Bowles* was partially based on hearsay from a confidential informant, with no showing regarding the informant's basis of knowledge, veracity, or reliability. The informant's information, however, was "substantially corroborated by the other factual information known by the police," 28 Kan. App. 2d at 494, including information (1) that on February 2 defendant purchased six cans of a starting fluid that is used in the manufacture of methamphetamine because it is 80% ether and

defendant used an alias in signing for the purchase; (2) that on January 30 defendant's brother, who had been convicted on drug charges and, by his own statements, was involved in manufacturing methamphetamine, bought solar tea jars, sulfuric acid, and plastic tubing, which are used in manufacturing methamphetamine; (3) that twice on February 9, law enforcement officers smelled the odor of ether coming from and in the vicinity of defendant's house; (4) that an officer who knocked on the door of defendant's residence to inquire about the odor was told by defendant that he had accidentally exploded a can of ether; and (5) that the same officer smelled a mild odor of ether around the house located catty-corner behind defendant's house and saw through the window of the detached garage a large jar with tubing coming from its top that appeared to his trained eye to be a gas generator used in the production of methamphetamine.

In other courts, as well as those in Kansas, cases in which an odor is involved in corroborating anonymous tips or tips from informants whose reliability has not been established typically differ from the present case by including more corroborating elements than just the odor. See *Kleinholz v. United States*, 339 F.3d 674 (8th Cir. 2003); *Fouse v. State*, 73 Ark. App. 134, 43 S.W.3d 158 (2001); *Pair v. State*, 184 S.W.3d 329 (Tex. App. 2006).

A case that ostensibly is one in which an odor is the only corroboration of a tip is *United States v. Elkins*, 300 F.3d 638 (6th Cir. 2002). *Elkins* details the investigation of a very extensive marijuana growing scheme. Several months of police surveillance began when police received an anonymous tip that there was a marijuana growing operation at 155 Scott, the building behind 155 Scott, and the house of James and Carol Elkins. Police learned that defendant employed off-duty police officers to guard buildings at 139 Scott, 155 Scott, 146 Neil, and 2896 Walnut Grove. They saw sheep-manure fertilizer, which is associated with marijuana cultivation, stacked on a pallet near 146 Neil. Thermal imaging equipment was used to scan heat output, and all four buildings had high heat outputs associated with marijuana cultivation. And three officers looking through a gap around an exposed pipe at 2896 Walnut Grove saw vegetation, which two identified as marijuana. One

of those officers heard ballasts, electrical devices used to regulate current flow to high-wattage lamps associated with marijuana cultivation, operating. With all this information, officers went to the Elkins' house. James Elkins gave permission to search the house, and "Carol Elkins escorted them through parts of it." 300 F.3d at 643. The officers saw no contraband but smelled "a strong, identifiable odor of marijuana." 300 F.3d at 643. With the Elkins' permission, police then searched the buildings at 139 and 155 Scott, finding marijuana, supplies, and equipment associated with marijuana cultivation and "remnants of marijuana growing" on the floor of a hidden room between the buildings. 300 F.3d at 644. When police forced the door at 2896 Walnut Grove to remove a man they saw enter and lock the door, they found six men, including two hiding in a space in the ceiling, and they saw "an extensive array of marijuana plants" and firearms. 300 F.3d at 645. Then police obtained search warrants for 2896 Walnut Grove, 146 Neil, and the Elkins' house. The affidavit used to procure the warrant to search the house did not include information about what had been observed and seized from the Elkins' other buildings. The affidavit stated that police had received a tip that marijuana was being grown in the house and that officers with substantial experience identifying the smell of marijuana smelled a strong odor of marijuana when visiting the house. The Sixth Circuit Court of Appeals concluded that the anonymous informant's tip was sufficiently corroborated by the three officers' smelling marijuana inside the house to establish probable cause for a search warrant. 300 F.3d at 659-60.

The factor that distinguishes *Elkins* from the present case is the same one that distinguishes this case from *State v. McDonald*, 253 Kan. 320, Syl. ¶ 2, 856 P.2d 116 (1993)—the odor of marijuana, an illegal substance, can provide probable cause standing alone. The federal Court of Appeals cited a number of cases holding that an officer's detection of the smell of marijuana by itself can establish probable cause for a search. See *Elkins*, 300 F.3d at 659. It is not surprising then that the odor of marijuana combined with an anonymous tip can furnish probable cause. In the present case, the ether smelled by the officers is not an illegal substance and we

decline to conclude that the odor of ether alone could establish probable cause for the search of Ibarra's vehicle. Where the odor alone does not furnish probable cause, this court should not use it to bootstrap insubstantial information in to establish probable cause.

Finally, both the Court of Appeals and the dissent have attempted to validate the search based upon the automobile exception to the Fourth Amendment to the United States Constitution. The *Ibarra* Court of Appeals simply erased the distinction between probable cause and exigent circumstances, stating that "exigent circumstances existed which provided officers with probable cause . . . ." Slip op. at 18. The exception to the requirement of a lawfully issued search warrant that is at issue in this case is probable cause to search *plus* exigent circumstances. See *State v. Mendez*, 275 Kan. 412, 421, 66 P.3d 811 (2003) (quoting *State v. Baughman*, 29 Kan. App. 2d 812, 814, 32 P.3d 199 [2001]). The Court of Appeals failed to properly apply the exception. The State must show probable cause exists whether the search is of an automobile or a residence, and if it does, then a search warrant is not required to search an automobile. The controlling factor in the present case is not whether exigent circumstances existed but rather whether probable cause existed to search Ibarra's automobile. It did not; the search was not constitutionally permissible, and the motion to suppress should have been granted.

As we previously stated, there was not sufficient probable cause and the search of the defendant's vehicle was unreasonable and unlawful and the evidence obtained as a result of that search should have been suppressed. Because our holding is dispositive of this appeal, we need not address the three remaining rulings which Ibarra challenged.

The judgment of the Court of Appeals affirming the district court's denial of the defendant's motion to suppress is reversed. The judgment of the district court is reversed, and the case is remanded.

GERNON and BEIER, JJ., not participating.

LARSON, S.J., and STEPHEN R. TATUM, District Judge, assigned.

LARSON, J., dissenting: I respectfully dissent from our reversal of the trial court's denial of Ibarra's motion to suppress the initial search of his motor vehicle.

The majority opinion frames the issue as being limited to the strong odor of ether emanating from the interior of a vehicle. I agree that ether is a lawful, noncontrolled substance, but under the facts of our case, the issue should refer to ether as a lawful substance being utilized in an unlawful manner in the manufacture of methamphetamine.

American jurisprudence, Kansas included, has not offered the same sanctity of privacy to moveable motor vehicles as the courts have to residences of involved individuals. For example, in *State v. Platten*, 225 Kan. 764, 769, 594 P.2d 201 (1979), we stated: "The Fourth Amendment protects a citizen's reasonable expectations of privacy and one's reasonable expectation of privacy in the home is entitled to unique sensitivity. [Citations omitted.]" However, a substantially diminished expectation of privacy exists with respect to motor vehicles. In *United States v. Chadwick*, 433 U.S. 1, 12, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (1977), it was stated: "But this Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts. [Citations omitted.]"

More recently, the United States Supreme Court, in *Pennsylvania v. Labron*, 518 U.S. 938, 940, 135 L. Ed. 2d 1031, 116 S. Ct. 2485 (1996), stated:

"Our first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's 'ready mobility,' an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear. [Citations omitted.] More recent cases provide a fur-

ther justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation. [Citation omitted.]"

I do not quarrel with the reasoning or result in *State v. Blair*, 31 Kan. App. 2d 202, 62 P.3d 661 (2002), but it is a residential case. We should not extend its authority to suppress a vehicle search of a mobile methamphetamine lab reeking of the strong odor of ether. We should view residence searches and motor vehicle searches in a completely different light justified by the universal holdings of the reduced expectation of privacy an individual has in a vehicle when utilizing the public roads and highways along with other drivers. The *Blair* opinion, quoted by the majority, also recognized this fact: "A home does not have the same mobility as a vehicle to pose a public safety threat to other drivers on the street . . . ." 31 Kan. App. 2d at 207-08.

I further believe we have unduly restricted our inquiry in this case to the "smell of ether," when the record reflects considerable additional evidence that justified the trial court's decision to not suppress the vehicle search.

We have suggested that when the facts material to the trial court's decision on the motion to suppress are not in dispute, the question of whether to suppress becomes a question of law over which our review is unlimited. See *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003).

The record reflects testimony at the suppression hearing by Detective Jeff Ward that he had received recent information that Ibarra had been manufacturing and selling methamphetamine. Detective Ward further testified that Cassie Mayes had reported to another detective that she had purchased pseudoephedrine cold tablets and given them to Ibarra. There was additional testimony that informants had told Detective Ward that Ibarra was doing part of the manufacturing of methamphetamine inside his vehicle while driving. Detective Ward also testified his opinion given to the officers at the scene that there was probable cause for the search was partially based on the informants' information and partially on the strong odor of ether reported coming from inside Ibarra's vehicle.

On cross-examination, Detective Ward admitted he did not share his information about Ibarra with the officers at the scene

and did not later put it in his application for a search warrant after the methamphetamine was found. On redirect examination, he said he was sure he had considered the information in addition to the strong odor, but he admitted on recross-examination that his testimony at the preliminary hearing was that he had based his decision on odor only. In any event, we have consistently upheld determinations of probable cause or reasonable suspicion based on imputing the knowledge of all other officers to the arresting officer. See, *e.g.*, *State v. Niblock*, 230 Kan. 156, 161, 631 P.2d 661 (1981).

In *State v. Wonders*, 263 Kan. 582, Syl. ¶ 11, 952 P.2d 1351 (1998), this court stated: "The totality of the circumstances surrounding an encounter and the seizing officer's training and experience all contribute to a trial court's findings regarding the seizure."

The dangerous nature of the manufacture of methamphetamine, see *State v. LaMae*, 268 Kan. 544, 551-52, 998 P.2d 106 (2000), and its usage and sale, see Peterson and Jennings, *Methamphetamine—A Recipe for Disaster*, 73 J.K.B.A. 7 (Oct. 2004), is well known and does not require an evidentiary basis in our unlimited review of a ruling on a motion to suppress.

Based on all of the testimony in the record, we should not limit our decision only to the strong smell of ether coming from a vehicle which has a diminished expectation of privacy. We should affirm the trial court's denial of Ibarra's motion to suppress.

There are several other cases which support the result we should reach.

The odor of ether was factually involved in *State v. Bowles*, 28 Kan. App. 2d 488, 490, 18 P.3d 250 (2001). The affidavit in support of a search warrant noted the strong odor of ether coming from a home. Additional facts were alleged in the affidavit, and the magistrate issued the search warrant. The magistrate's finding of probable cause was set aside by the district court, which was in turn reversed by the Court of Appeals, speaking through Judge David S. Knudson. "We conclude the factual representations of the affidavit would lead a reasonably prudent person to believe a methamphetamine lab and related contraband would be found at 312 North Logan." 28 Kan. App. 2d at 493. The odor of ether there,

like our case, was supported by other facts deemed sufficient to find probable cause sufficient for a search warrant to be issued.

The odor of ether was primarily involved in the unpublished opinion of a Kansas federal case, *United States v. Wilson*, 96 Fed. Appx. 640, 2004 WL 928270 (10th Cir. 2004), which held that the officer had reasonable suspicion of drug-related activity, and thus the scope of the defendant's detention, including the officer's request of the defendant to move a vest which was covering a bucket inside the vehicle, was not unreasonable under the Fourth Amendment to the United States Constitution. The officer had noted an odor of ether at the time of the traffic stop, the driver was known by the officer as someone suspected of involvement in the manufacture of methamphetamine, and the officer had seen a covered object between the defendant's feet that was large enough to contain implements used to manufacture methamphetamine.

The vehicle in *Wilson* was stopped by a Kansas deputy sheriff for the same reason Ibarra was stopped. The deputy testified he was suspicious because ether is used to manufacture methamphetamine. There were additional items, including lithium batteries, in plain view, and the bucket contained numerous items necessary for manufacturing drugs.

There was a lack of specific findings by the district court, and Wilson argued that the odor of ether alone cannot give rise to reasonable suspicion. Thus, the *Wilson* opinion did not ultimately lead to a probable cause determination, although the decision cited *United States v. Lopez*, 777 F.2d 543, 551 (10th Cir. 1985) ("holding the odor of 'an ether-like substance' in combination with other circumstances gave officers probable cause to search a vehicle"). See 96 Fed. Appx. at 647.

*Bowles, Wilson*, and *Lopez* provide additional authority for a holding that the presence of the odor of ether, a known smell found in the methamphetamine manufacturing process, provides a sufficient basis for a probable cause finding when coupled with the additional known facts.

While it has not been directly argued that we should adopt a "plain smell" exception to the Fourth Amendment search warrant requirements in motor vehicle cases, a reading of *State v. Mc-*

*Donald*, 253 Kan. 320, 856 P.2d 116 (1993), suggests that we did so there. In *McDonald*, the court stated: "Under the facts in the case at bar, the detection of the odor of fresh marijuana or marijuana smoke, *standing alone*, provides probable cause for a motor vehicle search following a checklane stop." (Emphasis added.) 253 Kan. 320, Syl. ¶ 2.

*McDonald* was cited in *State v. Bickerstaff*, 26 Kan. App. 2d 423, 424, 988 P.2d 285, *rev. denied* 268 Kan. 889 (1999), where Senior Judge Richard W. Wahl said:

"We hold Officer Dillow had probable cause to search Bickerstaff's vehicle for an open container. The odor of alcohol emanating from Bickerstaff's person, the odor of alcohol in her car, the breath test showing alcohol in her system, coupled with Bickerstaff's repeated denial that she had drunk anything alcoholic, all combined to give Officer Dillow probable cause to believe an open container was in Bickerstaff's vehicle and to conduct a warrantless search of the car."

There is no "standing alone" statement in *Bickerstaff*. The result clearly was not limited to the smell of alcohol.

We should not categorize *McDonald* as a marijuana case and *Bickerstaff* as an alcohol case and say that because they involved possibly illegal activities or controlled substances they are different from ether, a lawful, noncontrolled substance (which may be used unlawfully). To say the unlawful use of ether is different from the unlawful use of marijuana or alcohol is a distinction without a difference.

The argument that the odor of ether, a noncontrolled substance, cannot constitute probable cause was rejected in *United States v. Ryan*, 293 F.3d 1059, 1061-62 (8th Cir. 2002), and *United States v. Nation*, 243 F.3d 467, 470 (8th Cir. 2001). *Ryan* and *Nation* both state that in making the probable cause determination the relevant issue is not whether the particular conduct is innocent or guilty or whether the substance is legal or illegal, but the degree of suspicion associated with the conduct or the substance. 293 F.3d at 1061-62; 243 F.3d at 470 (quoting and relying on *Illinois v. Gates*, 462 U.S. 213, 243 n.13, 76 L. Ed. 2d 527, 103 S. Ct. 2317 [1983]).

Kansas adopted the "plain view" exception to the search warrant requirement of the Fourth Amendment in *State v. Galloway*, 232

Kan. 87, Syl. ¶ 2, 652 P.2d 673 (1982), and the "plain feel" exception in *Wonders*, 263 Kan. 582, Syl. ¶ 7. With adequate law enforcement training and considering the transitory nature of methamphetamine manufacturing and its public dangers, a "plain smell" exception might be justified and not unduly limit the historical protections of the Fourth Amendment. Leaving this discussion to another day, the possibility is well presented in the Note, *Wake Up and Smell the Contraband: Why Courts That Do Not Find Probable Cause Based on Odor Alone are Wrong*, 42 Wm. & Mary L. Rev. 289 (2000).

It is ironic and troubling that had a drug-sniffing dog been available and alerted on Ibarra's vehicle, we would undoubtedly be upholding a probable cause determination, while we now set one aside because it was based on the sense of smell of two well-trained law enforcement officers who identified the strong odor of ether associated with the manufacture of methamphetamine.

For all of the reasons previously set forth, I dissent from the majority holding herein. This court should affirm the Court of Appeals and the trial court on the suppression issue.